ISAAC KADIS v. E. G. BRITT.

(Filed 29 March, 1944.)

**1. Contracts § 7a—**

> Contracts in partial restraint of trade are contrary to public policy and void, unless shown to be reasonable. The burden of showing their reasonableness is upon the person relying thereon.

**2. Same—**

> The reasonableness and validity of a contract in partial restraint of trade is a question for the court and not for the jury, to be determined from the contract itself and admitted or proven relevant facts.

KADIS *v.* BRITT.

**3. Appeal and Error § 37c—**

On appeal from a judgment dissolving an injunction, the evidence is addressed to the court.

**4. Contracts § 7a: Master and Servant § 2—**

Equity will not specifically enforce, as of course, the naked terms of a negative covenant restricting other employment, unless ancillary to and supported by a valid affirmative covenant of the employer, who has a substantial right—unique in his business—which it is the office of the court to protect; and the restriction laid upon the employee has a reasonable relevancy to that result, and imposes no undue hardship.

**5. Same—**

The right of the employer to protect, by reasonable contract with his employee, the unique assets of his business, a knowledge of which is acquired in confidence during the employment and by reason of it, is recognized everywhere.

**6. Master and Servant § 7a—**

While an employee may not subsequently use written memoranda concerning customers entrusted to him or made by him for use in his principal's business, or copies thereof, or trade secrets of his employer, he is privileged to use, in competition with his former principal, the names of customers retained in his memory and methods and processes of doing business which are but variations of those in general use.

**7. Master and Servant § 2—**

Ordinarily, employment is a sufficient consideration to support a restrictive negative covenant in a contract, but will not, of course, aid it as to other defects.

**8. Same: Contracts § 5—**

Where a contract, containing a negative covenant against other employment, is exacted from an employee while he is, and has been for years, in the same employment, his position and duties and the nature of the business remaining the same, there is a threat of discharge and no present consideration.

**9. Injunctions § 4: Master and Servant § 2—**

Injunction will not issue to compel the performance of an affirmative promise of service, because that would result in involuntary servitude—man may sell his services but not himself.

**10. Contracts § 7a: Master and Servant § 2—**

Where a deliveryman and bill collector, after years of service, is required by his employer to enter into a written contract, without change in his position, duties, or nature of the employment, except the requirement that neither the employee nor any member of his family shall work in a business of the same character for two years after the cessation of the employment, the contract is unreasonable and void.

APPEAL by plaintiff from *Williams, J.,* at August-September Term, 1943, of WAYNE.

Plaintiff brought this action to enjoin the defendant from entering into employment with another concern in alleged violation of a contract hereinafter set forth.

The plaintiff was a retail clothing dealer in the city of Goldsboro, and the defendant had been for some years in his employment, his principal duties being that of deliveryman and bill collector. During his entire service with the plaintiff he never received more than $27.50 per week, and that only during the last few weeks of his employment. His compensation during the prior years had been less.

After he had been in the employment of the plaintiff for some years, they entered into the following contract:

"NORTH CAROLINA

WAYNE COUNTY

"THIS AGREEMENT, Made this the 7th day of December, 1940, by and between Isaac Kadis, party of the first part, and E. G. Britt, party of the second part:

"WITNESSETH: That whereas the said party of the second part is now an employee of the said party of the first part and the said E. G. Britt desires to continue in said employment for as long a period of time as the said Isaac Kadis shall desire from the date of this agreement; and whereas the said Isaac Kadis is desirous of continuing the said E. G. Britt in his employment so long as the said services of the said E. G. Britt shall be satisfactory to the said Isaac Kadis, and no longer:

"Now, THEREFORE, in consideration of the premises and for the purposes aforesaid and the mutual covenants and agreements herein contained, and the especial consideration of the continued employment of the said party of the second part by the said party of the first part after the date of the execution of this agreement and for the consideration of the sum of One Dollar ($1.00) each in hand paid to the other by the said parties of the first and second parts, the receipt of which is hereby acknowledged, the said parties have agreed as follows:

"The said party of the second part agrees to diligently and faithfully serve the said party of the first part in the transaction of his business and in such manner as the said party of the first part shall direct, *and the said party of the second part further agrees that he will not disclose or make known to any person or persons, firm or corporation any of the correspondence or business affairs whatsoever of the said party of the first part.* The said party of the second part further agrees that during the period of his employment by the said party of the first part that he will keep a true and accurate account of all moneys, goods and effects which may come into his hands for the said party of the first part and will not waste or destroy any of the same, or use same for his own per-

KADIS *v.* BRITT.

sonal use, or any part thereof, but shall at all times strive to the best interest of the said party of the first part in all things and will, when required, render an exact accounting of such properties coming into his hands for the said party of the first part.

"And the said party of the first part agrees to and with the said party of the second part that he will continue to employ the said party of the second part for such a time as the said party of the first part is in need of, or desirous of, the services of the said party of the second part. It being distinctly understood between the parties hereto that that part of this contract in reference to duration of employment is unspecified and solely rests in the discretion of the said party of the first part.

*"The said party of the second part further agrees that he will not work for, or be employed as an agent, servant, or employee, partner, shareholder, or in anywise interested in, any firm or corporation engaged in any business or businesses such as is conducted by the said party of the first part at the time of the cessation of employment between the said parties of the first and second parts, in Wayne County, North Carolina, for a period of two years from the date of such cessation of employment, nor in any county in North Carolina whose boundaries touch Wayne County, North Carolina, for said period of time; nor will, during said period of time nor within the vicinity herein designated, the said party of the second part allow or permit his wife or any member of his immediate family to engage in any business that is herein restricted and within the territory herein restricted as to the said party of the second part.*

*"It being expressly understood and agreed between the parties to this agreement that the continued employment of the said party of the second part by the said party of the first part, at and upon the date of the execution of this agreement, is one of the considerations of the said parties of the first and second parts in reducing this agreement to writing.*

"IN WITNESS WHEREOF, the said parties of the first and second parts have hereunto set their hands and seals, this the day and year first above written.

ISAAC KADIS    (SEAL)

E. G. BRITT    (SEAL)"

Pertinent parts of this contract involved in the discussion have been italicized for convenience.

The defendant served the plaintiff for about two years after the execution of this contract and was then discharged, the plaintiff saying that he needed him no longer, but expressing his satisfaction with the service and efficiency of the defendant.

Thereafter the defendant obtained employment for a short while driving a truck, but found himself physically unable to continue this work.

He then, within two years of the cessation of his employment with plaintiff, accepted employment with L. A. Collins, who was, and is, doing a clothing business in Goldsboro similar to that carried on by the plaintiff; and in his new employment, the defendant had a position and performed duties of the same kind performed by him in his former employment with plaintiff, but at a larger salary.

The defendant is about forty-five years old and has a family dependent upon him.

The plaintiff sued out this injunction to prevent the defendant from continuing in the employment of Collins. Upon the hearing before Judge Williams at the August-September, 1943, Term of Wayne Superior Court, judgment was rendered dissolving the injunction and dismissing the case, and plaintiff appealed.

*Paul B. Edmundson for plaintiff, appellant.*
*W. A. Dees for defendant, appellee.*

SEAWELL, J.  It is correctly stated in 17 C. J. S., Contracts, sec. 240, that "the distinction drawn between contracts in general and in partial restraint of trade by which the strict early common law rule invalidating all restraints was relaxed was subsequently replaced by the test of the reasonableness of the restraint." But it must be added that this test must be applied against a public policy which has come to recognize exceptions to the general rule. Contracts in partial restraint of trade do not escape the condemnation of public policy unless they possess qualifying conditions which bring them within that exception. They are still contrary to public policy and void "if nothing shows them to be reasonable." Benjamin on Sale, Seventh Ed., p. 535; *ibid.,* p. 538, quoting *Tindal, C. J.,* in *Horner v. Graves,* 7 Bing., 743. They must be supported under the rule which places the burden upon those who would avail themselves of an exception—at least to the extent that their reasonableness must be made to appear. Since the determinative question is one of public policy, the reasonableness and validity of the contract is a question for the court and not for the jury, to be determined from the contract itself and admitted or proven facts relevant to the decision. Benjamin on Sale, *supra,* p. 535. The appeal here is from a judgment dissolving the injunction and the evidence is addressed to the court.

Any contract in restraint of trade tends to produce or foster monopoly—a result peculiarly offensive to the age in which public policy against such agreements was engendered and became a fixed principle of the common law. At common law all contracts in restraint of trade were against public policy and void. In retreat from the severity of this rule toward justifiable exceptions, and particularly with respect to contracts

involving personal service, we can go only so far without coming into opposition to the public welfare as sponsored by government, and critically imperiling individual rights which our fundamental laws have declared to be inalienable. At that point, a superior sort of public policy supervenes, which does not have its root in the mere conveniences of trade, but in the necessity of self-support, both in its public and in its private implications.

The restrictive negative covenant in a contract of this sort, to be legally effective, must be ancillary to a valid affirmative covenant, and examination by the court is necessarily directed to the substance and validity of this covenant. When the contract is defective for want of a legally protectible subject or because its practical effect is merely to stifle normal competition, it is as much offensive to public policy as it ever was in promoting monopoly at the public expense and is bad. Hence, the trend of discriminating decision is away from the latitude by which contracts in restraint of employment have been upheld almost as a matter of course, or upon a merely plausible showing of some shadowy right to which the negative covenant is ancillary. The grave consequences of unemployment demand that the principal affirmative promise, and its basis or subject, be examined and weighed with care.

Whatever difficulty we may encounter in maintaining an equitable balance between conflicting interests of employer and employee under contracts like this, the effort of the court will not avail unless, in as far as it may be done with proper regard to the contract itself, and the public policy which supervises it, applicable rules are rationalized to the end that in each case the employer may be made to absorb such part of the vicissitudes of employment, unemployment and change of employment as justly belong to him, and the employee only those which are his. In short, equity will not specifically enforce, as of course, the naked terms of a negative covenant restricting other employment unless, supporting the affirmative promise, the employer has a substantial right—unique in his business—which it is the office of the court to protect; and the restriction laid upon the employee has a reasonable relevancy to that result, and imposes no undue hardship. But, after all this has been said, the right of the employer to protect, by reasonable contract with his employee, the unique assets of his business, a knowledge of which is acquired in confidence during the employment and by reason of it, is recognized everywhere.

The relaxation of the common law rule came about, not in the interest of monopoly, but in order to secure and make available to the creator thereof an intangible right of property in some peculiar product of his industry and skill—such as the good will of his business—and make his possession thereof unassailable or its transfer effective. While, generally

speaking, many of the rules which have been evolved in such cases are applicable to contracts involving restrictions on employment, both the English and the American courts make a substantial distinction between the two in administrative practice. 5 Williston on Contracts, sec. 1643, p. 4607. The distinction rests upon a substantial basis, since, in the former class of contracts we deal with the sale of commodities, and in the latter class with the performance of personal service—altogether different in substance; and the social and economic implications are vastly different.

Contracts restraining employment are looked upon with disfavor in modern law. *McCluer v. Supermaid Cookware Co.,* 62 Fed. (2d), 426; *Samuel Stores v. Abram,* 94 Conn., 248, 108 A., 54, 9 A. L. R., 1450; *Brown v. Williams,* 166 Ga., 804, 144 S. E., 256; *Love v. Miami Laundry Co.,* 118 Fla., 137, 160 So., 32; 22 Cornell Law Review, pp. 248 and 249; 5 Williston on Contracts, sec. 1643. And they have been held to be *prima facie* void. *McCluer v. Supermaid Cookware Co., supra.* From the beginning the argument against restraint of employment was—and still is— more powerful than those based on the evils of monopoly incident to restrictions in sales contracts. Restraint of employment tends not only to deprive the public of efficient service, but to impoverish the individual and make him a public charge at the expense of the taxpayer. *Clark Paper and Manufacturing Co. v. Stenacher,* 236 N. Y., 312, 150 N. E., 708, 29 A. L. R., 1325; also, Benjamin on Sale, *supra.* Modern thought, at least in this country, would perhaps place the emphasis on the plight of the individual who might be needlessly pauperized while ready, able and willing to work at his usual occupation for the support and independence of himself and his family. The preamble to our Unemployment Compensation Law recognizes the security of employment as a prime factor in the stability of government.

The problems presented by the restrictive provisions of sales contracts presented no great difficulty of solution. The modern infiltration of the device into ordinary employment in the common types of business and industry has given rise to serious questions, some of which are sharply outlined in the case at bar.

For the most part, cases of this class are concerned with the effort on the part of the employer to protect his business against the subsequent use, by a competitor, of trade secrets confidentially acquired in the course of employment; and, in so far as we may judge from the record and arguments, the case at bar is of that character. Such contracts are upheld only when they are "founded on valuable considerations, are reasonably necessary to protect the interests of the parties in whose favor they are imposed, and do not unduly prejudice the public interest." *Mar-Hof Co. v. Rosenbacker,* 176 N. C., 330, 97 S. E., 169; *Co-operative*

*Assn. v. Jones,* 185 N. C., 265, 117 S. E., 174; *Bradshaw v. Millikin,* 173 N. C., 432, 92 S. E., 161. To this must be added the condition that they do not impose unreasonable hardship on the covenantor, since modern decision has a thought—even though an afterthought—for the individual, as well as the public, the interests of which have heretofore been paramounted. *Milwaukee Linen Supply Co. v. Ring,* 210 Wis., 467, 246 N. W., 567, 568; 17 C. J. S., Contracts, sec. 254; *Milgram v. Milgram* (Ind. App.), 12 N. E. (2d), 394, 395.

Quoting from the contract, the promise of the defendant is that he "will not disclose or make known to any person or persons, firm or corporation any of the correspondence or business affairs whatsoever of the party of the first part." (the employer.) Under this provision the plaintiff complains that he will suffer an irreparable injury because of "the continued employment by the said L. A. Collins t/a Collins Clothing Company of the defendant . . . in that the system of conduct of the type of business conducted by the plaintiff, Isaac Kadis, would become known to, and the customers of said Isaac Kadis would be known to the said L. A. Collins t/a Collins Clothing Company, who would thereby acquire the same." The apprehended injury resulting from the violation of this promise is that the competitor Collins will, through Britt, obtain information respecting the customers of Kadis. There is no allegation or evidence that Britt either has violated or has threatened to violate his promise not to transmit information. It is apparently assumed that he will do so if afforded an opportunity through employment. To refrain from imparting information is the promise—loss of future employment is the sanction; and the Court is invited to impose the sanction without reference to whether there is any threatened violation of the promise. As to this, there is neither averment nor proof. If it be conceded that the restricted employee had occupied some position of prominence in the office, such as manager, or solicitor of customers, and occupied such a position in his new employment, we might consider whether from these facts alone there might be an inference that the former employer's trade secrets would be known and used in competition. We could hardly indulge that presumption without averment or proof as to an employee occupying the very subordinate position of Britt, both in his employment by the plaintiff and his subsequent employment by Collins; and injunction will not issue simply to appease a groundless apprehension on the part of the petitioner.

Injunctive relief against use in competition of confidentially acquired information of the customers of the employer has been frequently before the courts under varying factual conditions, and different conclusions have been reached. We call attention to some observations in texts and decisions which we think appropriately express our views:

In *Peerless Pattern Co. v. Pictorial Review Co.,* 147 App. Div. (N. Y.), 715, where the question of dealing with the customers of a firm was involved, the Court said: "All that clearly appears is that he (the employee) undertook to use in his new employment the knowledge he had acquired in the old. This, if it involves no breach of confidence, is not unlawful, for equity has no power to compel a man who changes employers to wipe clean the slate of his memory." (In this case there was no copying of the list of customers, and there was none in the case at bar.)

See, also, *Sachter's Ice C. Co. v. Sunshine Ice C. Co., Inc.,* 116 Misc. (N. Y.), 428, 429, in which the facts are comparable to those in the case at bar. Also see *Federal Laundry Co. v. Zimmerman,* 218 Mich., 211.

In 5 Williston on Contracts, sec. 1646, p. 4625, we find: "By the majority view, the knowledge of a deliveryman, or other personal solicitor, of the names and addresses of his employer's customers, gained during the performance of his duties, is not a trade secret, partly because the information would be readily discoverable, and partly because of the court's reluctance to deprive the employee of his subjective knowledge acquired in the course of employment."

In Restatement, Agency, section 396, it is said: "The agent may use general information concerning the methods of business of the principal and the names of customers retained in his memory, if not acquired in violation of his duty as agent."

In commenting on this clause, it is said, p. 898: "Thus, while an agent cannot properly subsequently use written memoranda concerning customers entrusted to him or made by him for use in the principal's business, or copies thereof, or processes which the employer has kept secret from other manufacturers, he is privileged to use in competition with the principal the names of customers retained in his memory as the result of his work with the principal and methods of doing business and processes which are but skillful variations of general processes known to the particular trade." *A fortiori* this should apply in the case of mere employees entering other similar employment.

Cases *pro* and *con* are numerously cited in texts and encyclopedias, and need not be listed here.

The defendant contends that the contract is without consideration, and with this we are inclined to agree. Ordinarily, employment is a sufficient consideration to support a restrictive negative covenant, but will not, of course, aid it as to other defects; *Scott v. Gillis,* 197 N. C., 223, 148 S. E., 315; and it has been frequently held that employment at will will afford such consideration, although some cases held that where the employment is at will, there must be provided a reasonable notice in order

that it may be accounted a consideration. Other cases hold that where the employment is actually continued for a substantial period, it may be considered as importing a consideration. To some of these holdings we will be compelled to dissent on principle; but the course of decision relieves us from more detailed discussion. For the most part, these cases featuring employment as constituting consideration will be found to deal with initial employment—where the employee is for the first time inducted into the service. It would seem that the principle has no reasonable application to situations like that presented in the case at bar, where the contract containing the negative covenant is exacted from the employee while he is, and has been for years, in the employment, where his position and duties are left unchanged, and the nature of the business remains the same, and where, in the nature of things, he must already have acquired such knowledge of the business as his position afforded. In that case, the question of consideration is narrowed to the question of discharge rather than to its correlative of employment, and in the case at bar that feature is frankly paramounted. The grammatical sense of the language used, taken with the context, plainly infers that *continued employment* must be understood to mean further *continuance in employment,* which more than implies the threat of immediate discharge. A consideration cannot be constituted out of something that is given and taken in the same breath—of an employment which need not last longer than the ink is dry upon the signature of the employee, and where the performance of the promise is under the definite threat of discharge. Unemployment at a future time is disturbing—its immediacy is formidable. The choice may be expected.

> "Ah, Take the Cash and let the Credit go,
>    Nor heed the rumbling of a distant Drum."

We think that the observation of Judge Williams in rendering his judgment is pertinent: "The . . . contract . . . was not based upon a valuable consideration moving to the defendant, E. G. Britt, as it in no particular whatever, in the opinion of the Court, increased, expanded or enlarged or in any way modified the obligations of the plaintiff, Isaac Kadis, in respect to the defendant, and does not modify the obligation of defendant to plaintiff, or operate to change the status of the parties on their contractual relationship in any manner, as employer and employee, as the same theretofore existed."

Injunction will not, of course, issue to compel the performance of the affirmative promise of service, because that would result in involuntary servitude, and for the same reason, it will not interfere to enforce the negative covenant when the apparent purpose and effect is to enforce the

affirmative promise to perform duties of the employment. *Clark Paper and Mfg. Co. v. Stenacher, supra.* In the contract itself,. to be safe on the principle of severability, these connotations must be kept widely apart—here they are blended.

It is true that the plaintiff has sought here merely to enforce the negative covenant of the contract, but primarily contracts are made to live by, not to law by. Whatever angle of the contract may be presented to the Court, and however the Court might be inclined to "carve out of the stipulation of the parties a contract and enforce it," we cannot ignore the fact that the defendant had lived by this contract for several years before the sword of Damocles fell, nor can we ignore the fact that the contract itself is of a type which, when exacted under the circumstances just outlined, is admirably adapted to effect economic peonage. The question arises whether a contract of that sort, no matter what angle is presented to the Court after the service has ceased, should not, in considering its reasonableness, be put upon the footing it had at the time it was made, and whether or not, however or whenever considered, it should not be held bad as against public policy, as it would doubtless have been held if the defendant had quit the service voluntarily and had been enjoined at that time. Mann, Cornell Law Quarterly, Vol. 22, pp. 246, 250. It is perhaps the most significant result of Democracy, properly organized and administered, that a man may sell his services, but not himself. In 5 Williston, p. 4647, we find: "For reasons analogous to those applicable to prohibitions of bargains in restraint of trade generally, there is a broad policy forbidding a man from contracting himself into slavery or unduly restricting his personal liberty. Bargains are illegal which deprive the party restrained of a reasonable opportunity to earn a livelihood."

However, we are not so much concerned with this question as we are with the question of undue hardship imposed upon the defendant. That neither he nor any of his family should work for another retail clothing company of a similar kind for two years following the cessation of his employment by the plaintiff, under the circumstances of this case, is a wider protection than any which the plaintiff might have demanded under any conscionable agreement for the protection of any peculiar right or unique asset which he has shown himself to have, if indeed any exists, in the business conducted by him; and therefore the prospect presented to the defendant of abandoning the only occupation for which he is fitted and in which he is experienced, or expatriating himself and family to find employment elsewhere, with persons to whom his character and proficiency are unknown quantities, is a hardship which equity will not impose.

---

GROCE *v.* MYERS.

---

Reference to our reports will show that it has been many moons since the Court has "frowned," in the old-fashioned sense of condemnation, and none has been profane in centuries. See *Dyer's Case*, 1614. We can only say that the case presented to us is devoid of any equity upon which the Court might grant the relief demanded by the plaintiff.

The judgment of the court below is

Affirmed.