WALDRON BUICK CO. v. GENERAL MOTORS CORPORATION AND LEE A. FOLGER, INC.

(Filed 1 March, 1961.)

**1. Pleadings § 28—**

Plaintiff may recover only upon the case made out by his pleadings.

**2. Monopolies § 2—**

Evidence tending to show only that an automobile manufacturer executed contracts with two dealers, giving each the exclusive agency for the make of car in their respective municipalities, some fourteen miles apart, that plaintiff dealer solicited sales in the municipality in which defendant dealer was located, that defendant dealer protested to the manufacturer, and that the manufacturer advised plaintiff dealer to desist from soliciting customers in defendant's territory, *is held* insufficient to show that the manufacturer and defendant dealer entered into an unlawful agreement or combination in restraint of trade, since defendant dealer was seeking merely to protect its valid contractual rights with the manufacturer. G.S. 75-1, 75-5(b) (6).

**3. Contracts § 7—**

Contracts in partial restraint of trade will be upheld when they are founded upon valuable consideration, are reasonably necessary to protect the interests of the parties, and are sufficiently limited in time and territory so that they do not adversely affect the interest of the public.

**4. Same—**

A contract between an automobile manufacturer and a dealer which gives the dealer for a period of less than two years the exclusive agency for the sale of the particular make of automobile within the dealer's municipality and its environs, in consideration of the dealer's contractual obligation to maintain its salesroom, staff of salesmen, and working capital up to prescribed standards and to contribute to the advertising fund for that make of car, will not be held an unlawful restraint of trade, the contract being limited in time and territory to that reasonably necessary for the protection of the dealer without adversely affecting the public interest, and being supported by valuable consideration.

APPEAL by plaintiff from *Campbell, J.,* February 29, 1960, Term, Schedule B, of MECKLENBURG, docketed and argued as No. 248 at Fall Term, 1960.

Civil action instituted January 18, 1957, by Waldron Buick Company (Waldron), a North Carolina corporation with principal office and place of business in Concord, Cabarrus County, North Carolina, against General Motors Corporation, a Delaware corporation, and Lee A. Folger, Inc. (Folger), a North Carolina corporation, with principal office and place of business in Charlotte, Mecklenburg County, North Carolina.

The action is to recover for alleged "severe financial losses, depletion of its assets, great injury to its credit and reputation, and

the total ruin of its business," alleged to have been proximately caused by alleged unlawful acts of defendants pursuant to defendants' alleged unlawful combination or conspiracy to restrain trade in Buick motor vehicles in and around Charlotte. Waldron alleges it sustained actual damages in the amount of $54,000.00. The action is to recover treble damages against defendants, jointly and severally.

The complaint alleges that General Motors, the manufacturer, agreed to sell Buick motor vehicles to Waldron under the terms of a "Direct Dealer Selling Agreement" entered into on or about April 25, 1955; that, while this dealership agreement obligated Waldron to develop the sale of such vehicles particularly in the area of Concord, it was specifically understood and agreed that the market area available to Waldron would include the City of Charlotte; and that Waldron, soon after establishing its business near Concord, on that section of U. S. Highway #29 running between Concord and Charlotte, began developing and promoting sales in accordance with its dealership agreement and in May and June, 1955, realized substantial profits from said business.

The complaint alleges further that Folger, which "held dealership rights under a contract with General Motors," had been "for several years" and was engaged in selling Buick vehicles in Charlotte and in a wide area surrounding Charlotte.

Paragraphs 8, 9 and 10 of the complaint, as amended, are as follows:

"8. In July, 1955, General Motors and Folger, as the plaintiff is informed and believes, willfully and unlawfully joined together in a combination or conspiracy to restrain trade in the area in and around Charlotte, North Carolina, to prevent competition in the selling of goods in that area, and to destroy the plaintiff's business, all in violation of the laws of North Carolina.

"9. That during the months from July, 1955, to July, 1956, inclusive, the defendants, pursuant to said illegal combination or conspiracy, willfully and unlawfully acted together to bring pressure upon the plaintiff to discontinue its sales activities, advertising, and sales promotion and solicitation anywhere within the City of Charlotte and suburban areas immediately adjacent thereto, and to cease all sales negotiations with persons residing in or near Charlotte, even where such negotiations were initiated by prospective purchasers, the sole purpose of this pressure being to restrain trade in that territory and to create an unlawful monopoly by destroying plaintiff's business and eliminating plaintiff as a competitor of Folger in and around the City of Charlotte, all in violation of the laws of the State of North Carolina.

"10. On July 24, 1955, General Motors, acting pursuant to this unlawful combination or conspiracy with the defendant Folger, ordered the plaintiff to cease immediately all sales activities in and around the City of Charlotte, and thereafter, during the period July, 1955, to July, 1956, by various direct and indirect pressures, forced the plaintiff to confine its sales promotion and activities in such way as to refrain from any form of competition with Folger in that area, all in violation of the laws of North Carolina. In furtherance of this illegal combination and conspiracy, General Motors required plaintiff during the months of August and September, 1955, to purchase an increasing number of Buick vehicles although, as General Motors well knew, such vehicles could not be profitably sold by plaintiff under the area restrictions which General Motors was unlawfully undertaking to impose."

Defendants filed separate answers.

Folger admitted "that during the times mentioned in the complaint and many years prior thereto, it had dealership contracts with General Motors, and pursuant thereto was engaged in the business of buying Buick automobiles from General Motors and selling them to the public in Charlotte and adjacent territory." Except as stated, Folger denied all material allegations of the complaint.

General Motors alleged it and Waldron had executed three dealership agreements, to wit, on April 25, 1955, November 1, 1955, and March 1, 1956; and that these documents, as provided therein, stated the entire agreement as to the rights and obligations of the respective parties. It alleged that, since 1937, it had executed successive dealership agreements with Folger. Except as stated, General Motors denied all material allegations of the complaint.

Each defendant pleaded in substance these further defenses: (1) The controversy is entirely private in nature and involves no injury to the public, hence G.S. 75-1 *et seq.*, do not apply; (2) plaintiff's action is barred by G.S. 1-54, the one-year statute of limitations; (3) plaintiff, by its acts and conduct, is estopped to maintain this action.

Plaintiff introduced its evidence and rested its case. The court, allowing the motion of each defendant therefor, entered judgment of involuntary nonsuit. Plaintiff excepted and appealed.

*Blakeney, Alexander & Machen for plaintiff, appellant.*

*Kennedy, Covington, Lobdell & Hickman and Henry M. Hogan for defendant General Motors Corporation, appellee.*

*Cochran, McCleneghan & Miller for defendant Lee A. Folger, Inc., appellee.*

BOBBITT, J.    Plaintiff seeks to recover treble damages for business losses allegedly caused by acts committed pursuant to an alleged unlawful combination or conspiracy entered into by defendants in July, 1955, to restrain trade in Buick automobiles in an area in and around Charlotte, North Carolina, to prevent competition in the selling of goods in that area, and to destroy plaintiff's business. G.S. 75-1, G.S. 75-16.

A plaintiff must make out his case *secundum allegata.* There can be no recovery except on the case made by his pleadings. *Andrews v. Bruton,* 242 N.C. 93, 95, 86 S.E. 2d 786, and cases cited; *Manley v. News Co.,* 241 N.C. 455, 460, 85 S.E. 2d 672, and cases cited.

The basic question is whether the evidence, when considered in the light most favorable to plaintiff, is sufficient to support a finding that the defendants entered into the alleged unlawful combination or conspiracy. Hence, the evidential facts stated below include only portions of the testimony and exhibits deemed pertinent to a determination of this basic question.

Waldron was incorporated in April, 1955. It commenced business in May, 1955, pursuant to its written agreement of April 25, 1955, with General Motors, as the Buick dealer in Concord. Folger was, and had been for many years, the established Buick dealer in Charlotte.

The dealership agreement between General Motors and Folger, in effect on and prior to April 25, 1955, and thereafter, provided: "FIRST: Subject to the terms and conditions hereof, Seller (General Motors) will sell and Dealer (Folger) will buy Buick motor vehicles and chassis and Dealer shall have the obligation to develop properly the sale thereof particularly in the" "Metropolitan Area of Charlotte, N. C.," defined as the City of Charlotte and a described portion of Mecklenburg County lying southeast of and immediately adjacent to the City of Charlotte.

The Folger dealership agreement provided that no changes as to the maximum number of dealers in said Charlotte area would be made by General Motors "unless and until a survey, analysis or review" thereof "has been made and at least sixty (60) days' notice of such proposed change shall have been given" to Folger so that it, if it desired to do so, would have opportunity to discuss the proposed change with General Motors prior to the effective date thereof. In an addendum, made a part of said dealership agreement and executed simultaneously therewith, General Motors established "at One (1)," to wit, Folger, the maximum number of Buick dealers to be located in said Charlotte area.

The dealership agreement of April 25, 1955, between General Motors and Waldron, provided: "FIRST: Subject to the terms and conditions hereof, Seller (General Motors) will sell and Dealer (Waldron) will buy Buick motor vehicles and chassis and Dealer shall have the obligation to develop properly the sale thereof particularly in the following area: CONCORD, NORTH CAROLINA."

Waldron established its place of business in leased premises located on U. S. Highway #29, "half a mile from the city limits of Concord and 14 miles from Charlotte . . . on the right-hand side as you go out 29 towards Greensboro." W. R. Waldron, Sr., and W. R. Waldron, Jr., executive officers of Waldron, resided in Charlotte. Waldron, Jr., had been sales manager in Charlotte for Young Motor Company, Ford Dealer in Charlotte. Waldron employed Gordon and Allison, who resided in Charlotte, as salesmen. They had previously been employed in Charlotte as salesmen (under Waldron, Jr.) for Young Motor Company. Gordon and Allison had "a clientele already built up in Charlotte, their primary duty was to sell cars and to develop the sales in the area of Charlotte and Mecklenburg County . . ."

In May, 1955, Waldron sold a total of twenty-one new Buicks, five in Charlotte, eleven in the Concord area, two in Kannapolis, two in Salisbury, and one (undesignated) elsewhere. In June, 1955, Waldron sold a total of twenty-four new Buicks, fourteen to residents of Charlotte, six in the Concord area, one in Kannapolis and three (undesignated) elsewhere. In July, 1955, Waldron sold a total of twenty-one new Buicks, eight in Charlotte, five in the Concord area, two in Kannapolis, two in Salisbury, and four (undesignated) elsewhere. Prior to July 15, 1955, Gordon and Allison (Waldron's salesmen) spent about ninety per cent of their time soliciting sales in Charlotte.

Testimony, admitted as to General Motors but not as to Folger, tends to show that officials of General Motors, prior and subsequent to the execution of Waldron's dealership agreement of April 25, 1955, but before the conference of July 20, 1955, discussed below, gave assurances that Waldron had the right to contact prospective purchasers and solicit sales in Charlotte and would be permitted and expected to do so.

Folger protested Waldron's sales activities in said Charlotte area.

On May 23, 1955, in a conversation between Spencer Folger, an official and stockholder of Folger, and Waldron, Jr., General Manager of Waldron, Spencer Folger said: "Bill, you have to get these salesmen out of Charlotte. They are over here working on our customers, calling on people that are interested in buying cars at Folger and that some of our salesmen are dealing with. You got to stay out of Charlotte. You got to quit this advertising. Now, Bill, you and I have

been friends for a long time. I have known you and your family but this is business. I put one dealer out of business and I got a lot of money and will put you out of business if you don't cut this out. I have a lot more money than you got."

In June, 1955, in a telephone conversation with Waldron, Jr., Spencer Folger said he was "very tired" of his salesmen reporting to him that Waldron's salesmen were still living in Charlotte and that they were following up deals in Charlotte. Also: "Now, Bill, you have got to move those men out of town; you have got to stay over there. If you don't I am going to put you out of business just like I have put another dealer out of business."

Prior to the conference of July 20, 1955, discussed below, Folger complained to General Motors of Waldron's interference with Folger's sales activities in Charlotte, contending its dealership agreement entitled it to protection therefrom.

The conference of July 20, 1955, was held in the Charlotte office of the Buick Motor Division of General Motors. Frank Leigh, an official of General Motors, Waldron, Jr., and Spencer Folger were present. Waldron asserted it had the right to continue active sales solicitation in said Charlotte area. Folger contended it had been designated the only dealer in said Charlotte area and that General Motors was obligated to protect it from interference by Waldron. In the course of the conversation, Spencer Folger said: "Frank, if you are going to let this man sell in Charlotte when we have a million-dollar investment here, I am going to Belmont and close my doors and I will operate the same way he is."

As the conference of July 20, 1955, concluded, Leigh said: "Bill, I have got to protect this dealer's investment here. This man has a large investment. . . . I want you to get into your own little back yard and get into the spirit of things. . . . I want you to get over there and sell your cars in Concord; leave Charlotte alone."

The following day, July 21, 1955, Waldron, Jr., in a letter to Leigh, said:

> "It was certainly nice of you to give Spencer and myself the time you did yesterday. It was a very understanding interview.
> "We know and appreciate that Spencer and Lee Folger have a large investment and are out to protect that investment. We also know that they are of the opinion that we are soliciting business in the Charlotte area. Frank, we can truthfully say that we are not soliciting business, but have followed up people who have expressed a desire to have us offer them a trade or straight sale proposition.

"In regards to your decision concerning following up any persons who might come over here and being unable to close a transaction in our place, we follow them up in Charlotte, we are not completely in accord.

"As we discussed yesterday, Mr. Jack Williams informed us that we could follow up any party desirous of having us offer them a proposition. This decision came after our discussing the Grant Motor Company of Kannapolis following up deals in the limits of Concord.

"We feel that if we are not allowed to follow up persons who are desirous of dealing with us, that we are being curtailed in an unfair way.

"You may rest assured that we are not intending to do anything contrary to your decision, under any circumstances, but we would appreciate your reviewing the situation and upon such reviewing, perhaps alter your decision to the point that we be allowed to follow up such persons who approach us and are desirous of having us offer to them a proposition.

"We will appreciate your consideration in this matter, and would like to know your feelings at your convenience."

Shortly thereafter, apparently in early August, 1955, Waldron, Jr., complained to Jack Williams, Buick's District representative for the Concord area, of the restrictions imposed by Leigh on Waldron's sales activities. Williams replied: "Now, this is Buick Motor Division's orders to me to give you. Bill, you stay out of Charlotte."

Waldron's dealership agreement of April 25, 1955, expired October 31, 1955. It executed a second dealership agreement dated November 1, 1955, containing identical provisions except as to duration. Its expiration date was stated as October 31, 1956. This was superseded by a third dealership agreement, effective from March 1, 1956, through October 31, 1960. This third agreement was terminated by Waldron in August, 1956.

After the conference of July 20, 1955, Folger's protests were directed principally to particular phraseology in Waldron's advertisements in Charlotte newspapers and over a Charlotte radio station and to one incident relating to alleged interference by Waldron's salesman with a Folger prospect who lived in Charlotte.

Allison moved to Concord in June or July, 1955. Gordon moved to Concord in August, 1955. After July 15, 1955, they spent about thirty per cent of their time in Charlotte. Waldron continued to advertise in Charlotte newspapers and over a Charlotte radio station. It employed "bird dogs in Charlotte," a "bird dog" being "one with whom

an arrangement is made to search out and refer prospective customers to the dealer." It continued to make sales in Charlotte until it terminated its dealership in August, 1956. In September, October, November and December, 1955, and in January, March, and July, 1956, Waldron sold more new Buicks in Charlotte than in Concord, and in May, 1956, sold an equal number (5) in each area. Of the total of 297 cars handled by Waldron, 98 were sold in Charlotte, 78 were sold in Concord, and 121 were sold in Kannapolis, Salisbury, Winston-Salem and Greensboro. The rest were sold at undesignated places or otherwise disposed of.

Although Waldron continued to solicit sales and to sell in said Charlotte area after the conference of July 20, 1955, it conducted these activities stealthily rather than openly. Waldron, Jr., testified: ". . . I instructed my men not to openly solicit in Charlotte. I told them—'If you have got to go over there, don't be seen.' . . . To the best of my recollection, they did follow my instructions."

The evidence, in our opinion, is insufficient to show that either General Motors or Folger intended or acted to destroy Waldron's business. What General Motors did, and all that it did, was to recognize the rights asserted by Folger by attempting, with a limited measure of success, to prohibit the solicitation of sales by Waldron in said Charlotte area. As to Waldron's activities in its own area of sales responsibility, the evidence discloses that General Motors cooperated fully with Waldron in its efforts to conduct a profitable business.

A letter of November 21, 1956, from Waldron, Sr., to General Motors, contains this final paragraph: "I want to take this opportunity to thank you for the splendid co-operation you gave us while we were in Concord. If I can reciprocate in any way, please do not hesitate to call upon me." Folger sold parts to Waldron, at first on credit and later (when Waldron failed to meet its obligations promptly) on a C.O.D. basis; and in January, 1956, from its own stock, sold a Buick to Waldron.

We pass, without discussion, defendants' contention that the evidence shows Waldron's business losses and insolvency were caused by limited resources, high operative costs, poor trading practices, etc. We assume, for present purposes, that the evidence is sufficient to show that Waldron sustained *some loss* on account of the restrictions imposed by General Motors upon its solicitation of sales in said Charlotte area.

We need not speculate as to what injury Folger might or would have inflicted upon Waldron by lawful competitive practices if General Motors had refused to recognize Folger's rights as exclusive Buick

dealer in said Charlotte area. In this connection, it is noted that General Motors did not, by the terms of said dealership agreements or otherwise, impose or attempt to impose any restrictions on Folger or on Waldron in respect of the resale price of Buick cars purchased by them from General Motors. Suffice to say, General Motors did recognize Folger as the exclusive Buick dealer in said Charlotte area at the conference of July 20, 1955. Apart from its insistence that it be so recognized, there is no evidence of any act of Folger by which Waldron was injured.

Prior to its dealership agreement with Waldron, General Motors had "established" Folger as its only Buick dealer in said Charlotte area. By doing so, we are of opinion, and so hold, that General Motors agreed that Folger was to have exclusive rights in respect of selling and soliciting sales within said Charlotte area. In this connection, it is noted that General Motors did not impose or attempt to impose any restrictions on Waldron's sales activities *except within said Charlotte area,* whether the prospect involved resided in Charlotte or elsewhere.

Waldron's action is based on the statutory provision declaring illegal "(e)very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina," G.S. 75-1, and particularly on G. S. 75-5(b) (6) which declares it unlawful for any person, "(w)hile engaged in buying or selling any goods in this State, to have any agreement or understanding, express or implied, with any other person not to buy or sell such goods within certain territorial limits within the State with the intention of preventing competition in sellng or to fix the price or prevent competition in buying such goods within these limits."

Under G.S. 75-1 *et seq.,* as interpreted in *Mar-Hof Co. v. Rosenbacker,* 176 N.C. 330, 97 S.E. 169, and later cases, "agreements in partial restraint of trade will be upheld when they are 'founded on valuable considerations, are reasonably necessary to protect the interests of the parties in whose favor they are imposed, and do not unduly prejudice the public interest.'" As stated by *Allen, J.,* in *Sea Food Co. v. Way,* 169 N.C. 679, 682, 86 S.E. 603: ". . . the true test now generally applied is whether the restraint is such as to afford a fair protection to the interests of the party in whose favor it is given, and not so large as to interfere with the interests of the public."

The validity of a covenant in a contract of employment providing that, upon termination of the employer-employee relationship, the employee will not engage in a business in competition with the employer, is determinable by these tests: (1) Is it founded on a valuable consideration? *Paper Co. v. McAllister,* 253 N.C. 529, 117 S.E. 2d

431, and cases cited. (2) Is it reasonably necessary to protect the legitimate interests of the employer? *Kadis v. Britt,* 224 N.C. 154, 29 S.E. 2d 543, and cases cited. (3) Is the limitation or restriction reasonable in respect of both time and territory? *Sonotone Corp. v. Baldwin,* 227 N.C. 387, 42 S.E. 2d 352; *Moskin Bros. v. Swartzberg,* 199 N.C. 539, 155 S.E. 154, and cases cited.

In connection with the sale of a business, including good will, the validity of a covenant providing that the seller will not engage in business in competition with the buyer is determinable by these tests: (1) Is it reasonably necessary to protect the legitimate interests of the purchaser? *Shute v. Shute,* 176 N.C. 462, 97 S.E. 392. (2) Is the limitation or restriction reasonable in respect of both time and territory? *Ice Cream Co. v. Ice Cream Co.,* 238 N.C. 317, 77 S.E. 2d 910, and cases cited.

In each of these two classes of cases, a limitation or restriction upon a person's right to engage in a lawful occupation or business is deemed detrimental to the public interest unless the restraint imposed is reasonable under the stated tests.

The cited decisions, while relating to diverse factual situations, establish the tests by which the reasonableness of a contract in partial restraint of trade is to be determined.

Waldron contends: If General Motors had expressly restricted Waldron to selling and to soliciting sales in the Concord area, such provision would be unlawful as violative of these statutory provisions; hence, any act of General Motors restricting Waldron from selling and from soliciting sales in the Charlotte area was unlawful.

Decision does not depend upon whether *a contractual provision* purporting to restrict Waldron from selling or soliciting sales in the Charlotte area *would be valid.* Waldron asserts it did not so contract but that the action of General Motors in attempting to impose such restriction violated its contract rights. However, Waldron does not allege a cause of action against General Motors for alleged breach of its obligations to Waldron under its dealership contracts.

Whatever the rights of Waldron and General Motors, *inter se,* and assuming the validity of its agreement with Folger, General Motors was obligated to recognize Folger as the sole and exclusive Buick dealer in the Charlotte area. If so, General Motors' obligations to Folger were in conflict with its alleged obligations to Waldron.

Obviously, Folger would not be guilty of participation in an unlawful combination or conspiracy by insisting upon its legal rights. Whether Folger entered into an unlawful combination or conspiracy with General Motors in violation of G.S. 75-1 *et seq.,* turns upon the answer to this question: Was it unlawful for General Motors and

Folger to enter into an agreement under which Folger was given the exclusive right to sell Buicks and to solicit sales within the area defined in Folger's dealership agreement?

It is noted that General Motors, not Folger, was subjected to the restraint imposed by its establishment and recognition of Folger as the sole and exclusive Buick dealer in the Charlotte area. Whether Folger was entitled to the protection afforded thereby depends upon whether this agreement in partial restraint of trade was reasonable under the applicable tests.

*Mar-Hof Co. v. Rosenbacker, supra,* deals with a similar factual situation. The plaintiff, a manufacturer, sued the defendant, a merchant, to recover an unpaid balance owing for goods sold and delivered. As a counterclaim, the defendant alleged that the plaintiff had agreed that defendant would have the exclusive sale of Mar-Hof middy suits in Winston-Salem for the 1916 and 1917 seasons but in breach of such agreement the plaintiff had placed a quantity of these suits with other retail dealers in Winston-Salem, and by reason thereof the defendant had sustained damages on account of diminishing sales and lost profits. The plaintiff, by demurrer, challenged the defendant's said counterclaim on the ground that the alleged agreement was void as violative of statutory provisions now codified as G.S. 75-1 *et seq.*

As set forth in the opinion of *Hoke, J.* (later *C.J.*), the allegations of the counterclaim were considered as alleging "that defendant, an established merchant in Winston-Salem, bought of plaintiff, a manufacturer of middy suits, desirous of introducing his goods into a new market, a large quantity of such middy suits, and in compliance with her agreement and as a part of the consideration, defendant had spent large sums of money and much time and effort in advertising the goods and popularizing them on the local market, and had lost heavily by plaintiff's breach of the agreement in placing designated quantities of the goods with other local dealers."

This Court *reversed* a decision sustaining plaintiff's said demurrer. It was held that a contract such as that alleged, when made in good faith, did not come within the prohibition of the statutory provisions now codified as G.S. 75-1 *et seq.*

Waldron, in its brief, referring to the *Mar-Hof* case, says:

"Under this case, a manufacturer, while still in possession of the natural monopoly of his own product, may elect to do business with only one distributor in a given community, and thereby give that distributor, in practical effect, an exclusive territory for the retailing of this product. He may even go further, and make a

legally enforceable agreement with the distributor that he will not also deal with any other distributor in that community.

"But that is as far as the holding in the *MAR-HOF* case goes. It does not purport to lay down any rule on whether or not the manufacturer may lawfully grant an exclusive franchise to a dealer in a particular area of this State and then agree *not to permit* any other dealer to sell in that area goods which that other dealer has purchased from the manufacturer."

Whatever the respective rights and obligations of Waldron and General Motors, *inter se,* if Folger did nothing more than insist upon legal rights conferred by the dealership agreement it entered into with General Motors prior to Waldron's dealership agreement of April 25, 1955, it did not thereby participate in an unlawful combination or conspiracy in restraint of trade.

As to the reasonableness of the restraint imposed on General Motors:

1. The agreement as to restraint was founded on a valuable consideration. Under its dealership agreement, Folger was required, *inter alia,* to comply with General Motors' requirements in respect of (a) the maintenance of its place of business, including "salesroom, service station, parts and accessories facilities," (b) working capital, (c) contributions to the Buick Advertising Fund. In addition, Folger was required to "maintain a staff of salesmen and a selling and customer relations organization adequate to take care of the sales potential" in said Charlotte area.

2. The protection afforded did not extend beyond the legitimate business interests of Folger. It related solely to sales activities within an area in which Folger had been the established Buick dealer for many years and in which it had a large investment.

3. In respect of time, the Folger dealership agreement in force on April 25, 1955, expired October 31, 1955. An agreement executed November 1, 1955, providing for expiration on October 31, 1956, was superseded by an agreement of March 1, 1956, providing for termination on October 31, 1960. In the two later agreements, General Motors, in like manner, established Folger as the exclusive Buick dealer in said Charlotte area.

4. The protection afforded did not appreciably interfere with the public interest. The restraint related solely to a single make of automobile, to wit, Buicks, in a highly competitive market. Moreover, Buick dealers in close proximity to Charlotte, including the Concord dealer, could sell to any resident of Charlotte. The only protection afforded Folger was an exclusive right to sell and to solicit sales *within the boundaries of said Charlotte area.*

Based on our decisions, particularly the *Mar-Hof* case, our conclusion is that General Motors' said agreement with Folger was not invalid as an unreasonable restraint on trade.

Most, if not all, pertinent decisions in other jurisdictions are discussed or cited in an article, "Restraints on Trade and the Orderly Marketing of Goods," by Stanley D. Robinson, 45 Cornell Law Quarterly (1959-1960), 254 *et seq.* Suffice to say, the conclusion reached herein is in accord with the weight of authority in other jurisdictions.

Two recent decisions are noteworthy, namely, *Schwing Motor Company v. Hudson Sales Corporation*, 138 F. Supp. 899, affirmed 239 F. 2d 176, and *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F. 2d 418, reversing 135 F. Supp. 4. While these were actions for treble damages under the Federal Anti-Trust Statutes, the basic question was the same as that here presented. It was held that an exclusive dealership in one make of automobile in a particular city, while it necessarily involved a limited monopoly to sell this product of the manufacturer in the area covered thereby, was not invalid as an unreasonable restraint on trade. As here, the agreements under consideration were not between competitors but imposed restraint upon a manufacturer and in favor of its dealer.

For the reasons stated, the evidence in our opinion was insufficient to support a finding, in accordance with Waldron's allegations, that General Motors and Folger in July, 1955, entered into an unlawful combination or conspiracy in restraint of trade.

Hence, the judgment of involuntary nonsuit is affirmed.

Affirmed.