Welch v. B&B Realty Invs., LLC, 2016 NCBC 40.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 7562

KENNETH JOHN WELCH, individually
and as Member of and on behalf of B&B
BRADFORD AND BERRINGTON, LLC,
and as General Partner of and for the
benefit of WELCH FAMILY LIMITED
PARTNERSHIP SEVEN,

              Plaintiffs,

v.

B&B REALTY INVESTMENTS, LLC,
D&J ASSOCIATES, INC., RICK BROWN
& ASSOCIATES, LLC, THE BRALOVE
GROUP, DAVID H. BRALOVE,
RICHARD W. BROWN, and B&B
BRADFORD AND BERRINGTON, LLC,

              Defendants.

**ORDER ON PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

1.     **THIS MATTER** is before the Court upon the Verified Motion for Preliminary Injunction (the "Motion") of Plaintiff Kenneth John Welch, individually and as Member of and on behalf of B&B Bradford and Berrington, LLC ("B&B"), and as General Partner of and for the benefit of Welch Family Limited Partnership Seven (collectively, unless individually identified, "Welch"), in the above-captioned case.

2.     Having considered Plaintiff's Motion, the briefs in support of and in opposition to the Motion, the Verified Complaint, appropriate evidence of record, and the arguments of counsel for the parties at a hearing held on Plaintiff's Motion on May 9, 2016, the Court hereby **DENIES** the Motion and **FINDS** and **CONCLUDES** as follows[1]:

---

[1] "It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits." *Lohrmann v. Iredell Mem'l Hosp., Inc*., 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) (citing *Huggins v. Wake Cnty. Bd. of Educ.*, 272 N.C. 33, 40–41, 157 S.E.2d 703, 708 (1967)).

## I. Procedural History

3.     Plaintiff filed its Verified Complaint and Motion for Temporary Restraining Order against Defendants B&B Realty Investments, LLC ("Realty Investments"), D&J Associates, Inc. ("D&J"), Rick Brown & Associates, LLC ("RBA"), The Bralove Group, David H. Bralove ("Bralove"), Richard W. Brown ("Brown"), and B&B Bradford and Berrington, LLC (collectively, "Defendants") on April 27, 2016, seeking to enjoin Defendants from transferring or distributing funds from B&B to Realty Investments, D&J, and RBA.

4.     On that same day, (i) the case was designated a complex business case and assigned to the undersigned, (ii) the Court held a telephone hearing on the Motion for Temporary Restraining Order, and (iii) the Court entered a Consent Order Granting Plaintiffs' Emergency Motion for Temporary Restraining Order (the "Consent TRO"), in which the parties agreed that all proceeds derived from the sale of the property in question would not be distributed to the members of B&B for a period of twelve days, through and including May 9, 2016.

5.     As agreed in the Consent TRO, Plaintiff filed the Motion and brief in support of the Motion and supporting documents on May 3, 2016, and Defendants filed a brief in opposition to the Motion and supporting documents on May 6, 2016.  The Court held a hearing on the Motion on May 9, 2016, at which all parties were represented by counsel.  At the conclusion of the hearing, counsel orally agreed to extend the Consent TRO through the Court's ruling on the Motion.

## II. Relevant Facts

6.      In 2008, Bralove and Brown approached Welch, a sophisticated real estate investor, seeking Welch's investment in a commercial real estate transaction involving the purchase, lease, and sale of certain real property located at 5827 Miami Boulevard and 5927 Miami Boulevard in Durham, North Carolina (the "Property").  B&B was formed for the purpose of acquiring, holding,

managing, maintaining, operating, developing, constructing, selling, exchanging, leasing, and otherwise utilizing the Property for profit. The Property was B&B's sole asset.

7. On August 11, 2008, the Members of B&B executed the original Operating Agreement (the "Original OA"). The Original OA designated Realty Investments as the non-Member Manager of B&B. Realty Investments has two members, D&J and RBA, which are controlled by Bralove and Brown, respectively.

8. On September 10, 2008, B&B acquired the Property. Wells Fargo Bank financed the purchase and extended a loan to B&B in the principal amount of $26,000,000 (the "WF Loan"). B&B also secured financing for the purchase from EagleBank in the amount of $5,000,000 (the "EB Loan"). Welch personally guaranteed both Loans, and collateralized certain personal real property in connection with the EB Loan.

9. In addition to serving as a personal guarantor of the Loans, Welch made an initial capital contribution of $2,300,000. Welch received a 53.4884% membership interest in B&B.

10. Section 4.1.1.1 of the Original OA provided that Welch was entitled to receive an amount equal to $20,000 for each calendar month (pro rata for any partial calendar month) up to a cumulative amount of $360,000, whereupon distribution under section 4.1.1.1 was to cease. This is defined in the Original OA as the "Welch Payment."

11. Section 4.1.1.2 of the Original OA provided that Welch was also entitled to distributions of "Cash Flow,"[2] to the extent any remained after the Welch Payment, until Welch received an amount of Cash Flow equal to a 16 percent Priority Return ("Priority Return").

---

[2] "Cash Flow" is defined in the definitions section of B&B's Operating Agreements as "all cash funds derived from operations of the Company other than from a Capital Transaction (including interest received on reserves), but less cash funds used to pay the Company Costs and Expenses and to pay or establish reasonable reserves for future expenses, debt payments (including, but not limited to, payments under the Loan), capital improvements, and replacements as determined by the Manager."

12.     Through Cash Flow generated from tenant leases up to and including May 2011, Welch received the full amount of the original Welch Payment as well as his monthly Priority Return. However, because regular Cash Flow was generated during a time of very low interest rates through May 2011, other Members shared in Cash Flow at higher rates than the Priority Return Welch had received under the Operating Agreement.

13.     In March 2011, Realty Investments, as Manager of B&B, began negotiating a modification of the WF Loan on behalf of B&B.  Prior to consenting to any modification of the WF Loan, Welch demanded that the Operating Agreement be amended for a second time[3] to permit his participation in Cash Flow pro rata like the other Members.  Because Welch's consent was required for B&B to enter into a modification of the WF Loan, the other Members agreed to Welch's demand.  Accordingly, the Second Amended Operating Agreement ("Second AOA") was entered into on February 22, 2011, reflecting the modified payments to Welch.

14.     Soon thereafter, B&B and Wells Fargo reached an agreement on the terms of the modification to the original WF Loan (the "WF Loan Modification").  As part of the WF Loan Modification, Wells Fargo required that B&B make a mandatory principal curtailment payment ("Mandatory Principal Curtailment") of $3,155,500 by June 1, 2011.  All Members, including Welch, agreed to the WF Loan Modification.

15.     B&B was unable to make the Mandatory Principal Curtailment, and the WF Loan Modification went into monetary default on that date.  B&B thereafter entered into several forbearance agreements with Wells Fargo (the "Forbearance Agreements") between June 1, 2011 and June 26, 2014 (the "Forbearance Period"), under which Wells Fargo "swept" all net monthly Cash Flow from operating the Property and applied these funds to principal curtailment payments.

---

[3] A First Amended Operating Agreement, dated November 26, 2008, was created for the purpose of transferring an interest from RBA to G-2 Properties, a new Member at that time.

16. Because of the payments made under the WF Loan Modification and Forbearance Agreements, no Cash Flow existed during the Forbearance Period, and distributions were suspended to B&B's Members, although Welch continued to receive the Welch Payment.

17. The WF Loan was eventually paid in full on June 26, 2014 through funds raised in a refinancing with ColFin BradBerr Funding, LLC (the "Colony Loan"). As a condition precedent to the refinancing of the Property, ColFin BradBerr Funding, LLC required that the Property be conveyed to BradBer Owner, LLC, an entity formed for the sole purpose of acquiring and holding title to the Property. B&B is the sole Member of BradBer, and Realty Investments is the Manager of BradBer. Defendants contend that Welch agreed and consented to the conveyance of the Property to BradBer.

18. On April 27, 2016, BradBer sold the Property to Crown Acquisition Associates, LLC. All Members, including Welch, consented to the sale of the Property.

19. Plaintiff contends that any profits from the sale constitute Cash Flow subject to pro rata distribution to B&B's Members under section 4.1 of the Second AOA. Defendants disagree, contending that the sale constitutes a "Capital Transaction" under section 4.2 of the Second AOA.

20. The Second AOA defines "Capital Transaction" as

> any transaction not in the ordinary course of business which results in [B&B's] receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damages awards, and insurance proceeds.

21. The Second AOA defines "Cash Flow" as "all cash funds derived from operations of [B&B] other than from a Capital Transaction . . . ."

22. Plaintiff seeks a preliminary injunction prohibiting distribution of any proceeds from the sale of the Property to Defendants or any Affiliate of Defendants.

## III. Analysis

23. The purpose of a preliminary injunction is ordinarily to preserve the *status quo* pending trial on the merits. Its issuance is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities. *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (citation omitted). A preliminary injunction "will be issued only (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Id.* at 401, 302 S.E.2d at 759–60 (citation omitted).

24. As to the first question, our Supreme Court has explained that likelihood of success on the merits means a "reasonable likelihood." *Id.* at 404, 302 S.E.2d at 761. As to the second question, "the trial court's . . . inquiry is not limited to the question of irreparable injury. The injunction will issue if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *Id.* at 405, 302 S.E.2d at 761–62 (emphasis removed) (internal quotation marks and citation omitted).

25. North Carolina courts have held that in assessing the preliminary injunction factors, the trial judge "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted. In effect, the harm alleged by the plaintiff must satisfy a standard of relative substantiality as well as irreparability." *Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

26. A party may show that it will suffer "irreparable injury" for which it has no adequate remedy at law where damages are difficult and cannot be ascertained with certainty. *See, e.g.*, *A.E.P. Indus.,* 308 N.C. at 406–07, 302 S.E.2d at 762 ("[O]ne factor used in determining the

adequacy of a remedy at law for money damages is the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach.").

27.    Welch alleges that the sale of the Property is a transaction in the ordinary course of business and cannot, therefore, be a Capital Transaction.  As support for this argument, Welch points to B&B's express purpose, as defined in section 2.3 of the Second AOA, which is to "sell, exchange, lease and otherwise use the Property for profit."  Welch argues that the sale of the Property fulfilled B&B's express purpose and thus could not constitute a transaction that was outside the ordinary course of B&B's business.

28.    The Court disagrees.  Indeed, it appears to the Court that several provisions of the Second AOA suggest that a sale of the Property, B&B's sole asset, is not in the ordinary course of business and is instead a Capital Transaction under the Agreement's express terms.

29.    First, section 2.3 specifically states that "[B&B] is not authorized to do, and shall not, engage in any business other than as described in this Section."  Thus, by its own terms, the Second AOA contemplates that not every activity that comes within the scope of B&B's purpose in section 2.3 is "in the ordinary course of business."  If Welch's argument is correct, B&B would not be authorized to undertake any transaction *not* in the ordinary course of business, and the provisions in the Second AOA contemplating a Capital Transaction—a transaction expressly described as outside the ordinary course of business—would be meaningless.

30.    In addition, the sale of the Property constitutes an "event of dissolution" under section 7.1(a) of the Second AOA, and it appears to the Court from its review of the Second AOA that a transaction that results in dissolution of the company is not contemplated as one occurring in the ordinary course of B&B's business.

31.     Finally, section 5.1.1 provides the Manager with broad authority to operate B&B's day-to-day affairs, and section 5.1.15 requires the prior consent of the Members to sell any B&B asset or property.  It appears to the Court that these provisions contemplate that a sale of the Property, unlike the receipt and distribution of rents and profits, was not a transaction occurring in the ordinary course of B&B's business.

32.     Accordingly, based on its review of the record evidence before the Court, including the express language of the Second AOA considered as a whole,[4] the Court concludes, in the exercise of its discretion, that Welch has failed to demonstrate a reasonable likelihood of success on the merits of its claim for a declaratory judgment determining that proceeds from the April 27, 2016 sale of the Property constitute Cash Flow under the Second AOA.

33.     The Court further concludes that the alleged damages arising in connection with Welch's remaining claims are not of such a "peculiar nature that compensation in money cannot atone for it."  *Frink v. N.C. Bd. of Transp.*, 27 N.C. App. 207, 209, 218 S.E.2d 713, 714 (1975) (quoting *Gause v. Perkins*, 56 N.C. 177 (1857)).  Thus, the Court concludes that Welch is not entitled to preliminary injunctive relief based upon these claims because Welch has an adequate remedy at law through a claim for the recovery of monetary damages for Defendants' alleged conduct.  *See, e.g.*, *Bd. of Light & Water Comm'rs v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423, 271 S.E.2d 402, 404 (1980) ("Where there is a full, complete and adequate remedy at law, the equitable remedy of injunction will not lie."); *Whalehead Props. v. Coastland Corp.*, 299 N.C. 270, 283, 261 S.E.2d 899, 907–08 (1980) (discussing money damages as a legal remedy).

---

[4] *See, e.g.*, *Robbins v. C.W. Myers Trading Post, Inc.*, 253 N.C. 474, 477, 117 S.E.2d 438, 440–41 (1960) ("A contract must be construed as a whole, and the intention of the parties is to be collected from the entire instrument and not from detached portions . . . .  Individual clauses in an agreement and particular words must be considered in connection with the rest of the agreement . . . .") (quoting 17 C.J.S. Contracts § 297).

34. Indeed, it appears to the Court that Welch's remaining claims seek readily ascertainable monetary damages against Defendants for alleged conduct causing alleged injury to Welch in the past, and that Welch's challenge to the distribution of the proceeds of the sale of the Property, which is controlled by the express terms of the Second AOA, is not a necessary or proper remedy in these circumstances. *See, e.g.*, *State ex rel. Bruton v. Am. Legion Post*, 256 N.C. 691, 693, 124 S.E.2d 885, 886–87 (1962) ("Completed acts and past occurrences in the absence of any evidence tending to show an intention on the part of the defendants to [commit future violations], will not authorize the exercise of the court's injunctive power.").

35. This is particularly true here, both because Welch has failed to show that his monetary remedy is inadequate in any respect, and because Defendants have shown that delay in the distribution of the sale proceeds will cause them substantial hardship in meeting their estimated tax payment obligations arising from the sale, which include incurring penalties and interest in the event payments cannot be made or are delayed, as well as the costs incurred to finance, or liquidate assets to pay, the estimated tax obligations when due. *See, e.g.*, *Elec. S., Inc. v. Lewis*, 96 N.C. App. 160, 165, 385 S.E.2d 352, 355 (1989) ("Because grant of an injunction is an equitable matter, the trial court in its sound discretion considers the 'question of undue hardship imposed on the defendant.'") (quoting *Kadis v. Britt*, 224 N.C. 154, 158, 29 S.E.2d 543, 545 (1944)).

36. The Court concludes that, based on the evidence and other submissions of record, Welch has failed to show that he will suffer irreparable harm absent the entry of a preliminary injunction or that a preliminary injunction is necessary for the protection of Welch's rights during the course of this litigation.

37. The Court has engaged in a balancing process, weighing potential harm to Welch if a preliminary injunction is not issued against the potential harm to Defendants if injunctive relief is

granted, and finds that the potential harm to Defendants outweighs that to Welch, the balance of the equities and the ends of justice do not support granting this preliminary injunction, and a denial of Welch's Motion in this case is not adverse to the public interest.

38. The Court therefore concludes that a preliminary injunction should not issue and, accordingly, that Welch's Motion for Preliminary Injunction should be denied.

IV. Conclusion

39. Accordingly, based on the foregoing reasons, the Court hereby **DENIES** Plaintiff's Motion.

**SO ORDERED**, this the 13th day of May, 2016.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases