KNC Techs., LLC v. Tutton, 2021 NCBC 25.

STATE OF NORTH CAROLINA

DAVIDSON COUNTY

KNC TECHNOLOGIES, LLC, f/k/a
KEN-NECT COMMUNICATIONS,
L.L.C.,

Plaintiff,

v.

ERIC TUTTON and I-TECH
SECURITY & NETWORK
SOLUTIONS, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 793

**ORDER AND OPINION ON
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT,
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, AND
DEFENDANTS' MOTION TO
EXCLUDE**

THIS MATTER comes before the Court upon Plaintiff KNC Technologies LLC ("KNC"), f/k/a Ken-Nect Communications, L.L.C.'s Motion for Partial Summary Judgment ("KNC's Motion for Partial Summary Judgment," ECF No. 63), Defendants Eric Tutton ("Tutton") and I-Tech Security & Network Solutions, LLC's ("I-Tech;" collectively, Tutton and I-Tech are referred to as "Defendants") Motion for Summary Judgment ("Defendants' Motion for Summary Judgment," ECF No. 64; together with KNC's Motion for Partial Summary Judgment, the "Motions for Summary Judgment"), and Defendants' Motion to Exclude Expert Testimony of Erik Lioy ("Motion to Exclude," ECF No. 68; together with the Motions for Summary Judgment, the "Motions").

THE COURT, having considered the Motions, the evidentiary materials filed by the parties, the briefs filed in support of and in opposition to the Motions, the arguments of counsel at the hearing on the Motions, the applicable law, and other

appropriate matters of record, CONCLUDES, that the Motions should be GRANTED, in part, and DENIED, in part, as set forth below.

> *Van Sickle Law, PLLC by R. Matthew Van Sickle for Plaintiff KNC Technologies, LLC, f/k/a Ken-Nect Communications, L.L.C.*

> *Fitzgerald Litigation by Stuart Punger for Defendants Eric Tutton and I-Tech Security & Network Solutions, LLC*

McGuire, Judge.

1.     The present dispute arises from KNC's former employment of Tutton and Tutton's violation of a Non-Compete and Solicitation Agreement which he entered with KNC ("Non-Compete Agreement," ECF No. 3, at Ex. A, pp. 20–25). Tutton's violations of the Non-Compete Agreement were the subject of two prior lawsuits: one against Tutton (*Ken-Nect Communications, L.L.C. v. Eric Tutton*, 13-CVS-07572 (Forsyth County)[1] (hereinafter, "*Tutton I*")) and the other against Tutton's then-employer, Nitor Solutions, Inc. ("Nitor") (*KNC Technologies, LLC v. Nitor Solutions, Inc.*, Case No. 1:14-cv-00874 (M.D.N.C. 2014) (hereinafter, the "Nitor Lawsuit")).   Both lawsuits were settled before trial.   As part of the settlement of *Tutton I*, KNC and Tutton executed a Confidential Waiver, Release, and Settlement Agreement ("Settlement Agreement," ECF No. 3, at pp. 26–30) and a Consent Order for Permanent Injunction and Dismissal of Remaining Claims and Counterclaims ("Consent Order," ECF No. 3, at pp. 31–33).   In this action, Tutton, along with a company he formed, I-Tech, are alleged to have violated the terms of the Settlement Agreement and Consent Order.   Both parties now move for summary judgment.

---

[1] KNC was formerly known as Ken-Nect Communications, L.L.C.

I.    FACTS

2.    "Although findings of fact are not necessary on a motion for summary judgment, it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62 (2010).

A.    **Background**

3.    KNC is in the business of installing low-voltage infrastructure, primarily for communications and safety applications.  KNC employed Tutton as a field technician and then as a project manager from 2006 until October 2012, and again from November 19, 2012 until November 14, 2013.[2]  (ECF No. 3, at ¶ 7, Ex. C, pp. 12–13.)  As part of Tutton's second stint of employment with KNC, Tutton signed the Non-Compete Agreement.  The Non-Compete Agreement prohibited Tutton from working for KNC's competitors for a period of three (3) years following Tutton's termination from KNC and prohibited him from disclosing KNC's trade secrets and confidential information.  (*Id*. at Ex. A, at ¶¶ 6–7.)

4.    On November 14, 2013, Tutton resigned his employment with KNC and began working for Nitor, a competitor of KNC.  Prior to his resignation, Tutton helped Nitor download "files containing KNC's customer and supplier information, pricing schemes, project plans and designs, estimates, and bids."  (Aff. of Eric Tutton, *Id*. at Ex. 1, ¶¶ 7–26.)  After joining Nitor, Tutton contacted KNC's customers and helped Nitor successfully solicit business from those customers.  (*Id*. at ¶¶ 31–40.)  KNC

---

[2] Tutton quit working for KNC for a brief period in October 2012.  (ECF No. 3, at Ex. 1, ¶ 6.)

subsequently sued Tutton for breach of the Non-Compete Agreement in Forsyth County Superior Court (*Tutton I*), claiming, *inter alia*, that Tutton provided KNC's confidential business information to Nitor.

5.  In September 2014, KNC and Tutton settled *Tutton I* by executing the Settlement Agreement and the Consent Order, both of which Tutton entered voluntarily and with representation of counsel. (*Id.* at Exs. 2–3.) The Settlement Agreement provided, *inter alia*, the following: "Tutton shall pay [KNC] the sum total of Five Thousand and No/100 Dollars ($5,000)"; "the Parties shall file a stipulation of dismissal without prejudice of all claims and counterclaims asserted in the Lawsuit"; and

> Tutton consents and agrees to the entry of a Permanent Injunction against him for a period of (10) years through and including August 31, 2024 (the "Restricted Period") in accordance with the terms of the proposed Consent Order for Permanent Injunction attached as Exhibit A. Pursuant to the terms of the Permanent Injunction and during the Restricted Period, Tutton shall not directly or indirectly (i) solicit, contact, and/or make sales to [KNC] customers, (ii) solicit, contact, and/or make sales to the suppliers enumerated on Exhibit A, (iii) disparage, defame, slander, and/or malign [KNC], and (iv) retain or use any of its trade secrets or confidential and proprietary information. The parties shall work cooperatively and in good faith to obtain entry of the proposed Consent Order for Permanent Injunction attached as Exhibit A.

(*Id.* at Ex. 2, ¶¶ 1–2, 4.)

6.  The Settlement Agreement contains the following liquidated damages provision:

> [i]f at any time it is determined that Tutton has breached the terms of the Permanent Injunction to be entered by the

> Court pursuant to this Agreement, Tutton acknowledges and agrees that [KNC] shall be entitled to a payment of liquidated damages in the amount of Twenty-Five Thousand and No/100 Dollars ($25,000.00) per violation.

(*Id.* at ¶ 6; hereinafter, the "Liquidated Damages Provision.") Further, the Settlement Agreement states: "[t]he Parties agree that this Agreement shall not be subject to any claims of mistake of fact and that it expresses a full and complete settlement." (*Id.* at ¶ 9.)

7. The parties filed the Consent Order in Forsyth County Superior Court, and on September 17, 2014, the Honorable Susan Bray entered the Consent Order. The Consent Order contained the following prohibitions on Tutton's activities:

> a. [Tutton] is prohibited and enjoined from indirectly or directly soliciting[,] contacting, and/or making sales to any customers of [KNC].
>
> b. The term "Customers" as used herein shall mean any party for whom [KNC] had provided services as of November 14, 2013.

(*Id.* at Ex. 3, ¶¶ 1–2; hereinafter, the "Customers Restriction.")

> c. [Tutton] is prohibited and enjoined from indirectly or directly soliciting, contacting, and/or making sales to any Suppliers of [KNC].
>
> d. The term "Suppliers" as used herein shall mean Accu-Tech Corporation, ADI, Anixter, Inc., Communications Supply Corporation, Graybar Electric Company, Blackboard, Black Box, Norfolk Wire, and ScanSource and their operations in North Carolina, Virginia, South Carolina, Tennessee, and Georgia.

(*Id.* at Ex. 3, ¶¶ 3–4 (hereinafter, the "Suppliers Restriction.") The Consent Order states that it will "dissolve automatically on August 31, 2024," and that "[Tutton]

waives any and all rights to seek modification to or relief from its terms until its natural expiration." (*Id*. at ¶ 9.)

## B. Post-execution of Settlement Agreement and Consent Order

8.      After the Settlement Agreement and Consent Order were executed and entered by the Forsyth County Superior Court in September 2014, Tutton worked for Performance Cabling Technologies ("Performance")[3] until he eventually left to help form I-Tech in April 2015.  I-Tech is a member-managed limited liability company comprised of three members:  Tutton, as President, holding a 49% membership interest; Michelle Tutton (Tutton's wife), as Assistant Vice President, holding a 41% membership interest; and Regina Bagby (Tutton's mother), as Vice President, holding a 10% membership interest.  (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 10; ECF No. 15.2.)  Performance and I-Tech perform many of the same services as KNC.

9.      KNC alleges that Tutton, either while he was employed with Performance or as member-manager of I-Tech, "solicit[ed], contact[ed], and/or ma[de] sales to" several of KNC's customers in violation of the Consent Order.  The evidence establishes that after entry of the Settlement Agreement and Consent Order, Tutton performed work directly for the following KNC customers: Guilford County Schools ("GCS"), the City of Winston-Salem, and Inmar.  Tutton also performed work for the following KNC customers indirectly as a subcontractor for Johnson Control

---

[3] Tutton left Nitor and began working for Performance in March 2014, prior to the Consent Order being entered by Judge Bray in September 2014. (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, pp. 2–3.)

International PLC ("JCI"): Arbor Acres; the City of Greensboro; Teleflex; Thomas Bus; Wake Forest Baptist Hospital ("WFBH"); Michael Cotrone ("Cotrone"); and the Veterans Administration ("VA").

10. KNC also alleges that Tutton contacted KNC's suppliers Accu-Tek, ADI, Norfolk Wire, Communication Supply Corp. ("CSC"), and Graybar in violation of the terms of the Consent Order. (ECF No. 73, at pp. 5–9.)

11. While many of Tutton's contacts with the aforementioned customers and suppliers are undisputed (*compare* ECF No. 72, at pp. 12–16 *with* ECF No. 73, at pp. 6–11), the details of each contact as well as their implication with respect to the Settlement Agreement and Consent Order are heavily contested. Nevertheless, the evidence in the record establishes the following undisputed material facts:

*i. GCS*

12. KNC invoiced GCS on multiple occasions for services as early as 2005, and Tutton worked on GCS jobs while employed with KNC. (ECF No. 66.11 [SEALED], at pp. 87–117; ECF No. 67.15 [SEALED], redacted at ECF No. 75.2, at pp. 27–30.) I-Tech provided services for GCS on numerous occasions from 2015 through 2019. (*See* ECF No. 67.7 [SEALED], at pp. 1–5). With respect to Tutton's contact with GCS while at Performance, GCS was already a customer of Performance when Tutton became employed by Performance in 2014. (*See* ECF No. 87.3, at pp. 1–5.) However, according to Performance president Gordon E. Drumwright ("Drumwright"), while Performance was working a job for GCS, Tutton individually contacted GCS to negotiate subcontractor work for what would become I-Tech, and

Tutton resigned to pursue that work with I-Tech shortly thereafter in 2015. (ECF No. 67.5, at p. 16.)

*ii. City of Winston-Salem*

13. KNC invoiced the City of Winston-Salem for services on multiple occasions from 2009 through 2013, and Tutton worked on City of Winston-Salem jobs while employed with KNC. (ECF No. 66.11 [SEALED], pp. 28–29; ECF No. 67.5, at pp. 8, 15.) According to Drumwright, Tutton made contact with the City of Winston while at Performance by attending "bid meetings when he was chasing a bid at the City of Winston." (ECF No. 67.5, at p. 15.) There is no evidence that I-Tech performed services for the City of Winston-Salem.

*iii. Inmar*

14. KNC invoiced Inmar for services on two occasions in 2009 and 2010. (ECF No. 66.11 [SEALED], at p. 128.) Since that time until at least 2018, KNC has not provided work directly for Inmar. (ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 21; ECF No. 66.11 [SEALED], at p. 128.) KNC believes it may have provided services indirectly for Inmar as a subcontractor but could not verify the accuracy of this statement. (ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 21.) Inmar's subpoena response indicated that it could not locate "any statements of work, work orders, purchase orders, procurement records regarding accounts receivable, or records regarding accounts payable" involving KNC from November 9, 2012 through December 31, 2017. (ECF No. 66.8 [SEALED], redacted at ECF No. 79.1, at p. 39.) Tutton did not know KNC performed work for Inmar. (ECF No. 66.2

[SEALED], redacted at ECF No. 74.2, at p. 11.) There is no evidence that Tutton performed services directly for Inmar while at KNC. I-Tech performed numerous services directly for Inmar from 2015 through 2019. (ECF No. 67.7 [SEALED], at pp. 9–13; ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 21.)

*iv.* *Cotrone*

15. KNC provided services to Cotrone in 2010 and 2012. (ECF No. 66.11 [SEALED], at pp. 64–65.) Cotrone contacted Tutton in 2017, when Cotrone was employed by Intelligent Visibility, Inc. ("Intelligent Visibility"), to discuss the potential of Tutton working with Cotrone on a project at Carteret General Hospital ("CGH"). (ECF No. 14.4, at ¶¶ 1, 5.) ████████████████████████ ███████████████████████████████████. (ECF No. 66.11 [SEALED], at pp. 25, 407, 441.) Cotrone, "a longtime customer of KNC technologies, including from November 14, 2013 to the present," knew that "[CGH] was also a customer of KNC." (*Id.* at ¶¶ 4, 6.) Upon learning of the Consent Order, Cotrone "decided to not have any further communication with Mr. Tutton." (*Id.* at ¶ 7.) Tutton never disclosed the existence of the Consent Order to Cotrone during their conversation regarding the CGH project. (*Id.*)

*v.* *VA*

16. KNC invoiced the VA's Salisbury and Winston-Salem, North Carolina locations ████████████████████. (ECF No. 66.11 [SEALED], at p. 226; ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 13.) I-Tech performed

services for the VA solely at the Durham, NC location ████████.[4] (ECF No. 67.7 [SEALED], at pp. 6–8; ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 5.)

### vi. *Sub-contractor work for JCI*

17. It is undisputed that Defendants performed work for certain KNC customers only as a subcontractor for JCI. JCI was never a KNC customer. (*See* ECF No. 66.11 [SEALED].) Rather, JCI installs proprietary systems, and subcontracts some of its labor to I-Tech. (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, pp. 16–17.) Defendants performed services as a subcontractor of JCI for the following KNC customers: (a) Arbor Acres, (b) the City of Greensboro, (c) Teleflex, (d) Thomas Bus, and (e) WFBH.

#### a. Arbor Acres

18. KNC invoiced Arbor Acres for services ███████ during the period January 2003 through November 2013, all in 2012. (ECF No. 66.11 [SEALED], at p. 5). Tutton did not know KNC ever performed work at Arbor Acres. (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 17.) There is no evidence that Tutton performed work directly for Arbor Acres while at KNC. I-Tech performed services for Arbor Acres as a subcontractor of JCI ██████. (ECF No. 67.7 [SEALED], at pp. 14–17; ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at pp. 15–16.)

#### b. City of Greensboro

---

[4] KNC submitted one unsuccessful bid to the Durham VA location. (ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 13.)

19.     KNC invoiced the City of Greensboro for services ████████████ ██████. (ECF No. 66.11 [SEALED], at p. 120.)  There is no evidence that Tutton worked directly for the City of Greensboro while at KNC.  I-Tech performed services as a subcontractor of JCI for the City of Greensboro in 2018.  (ECF No. 67.7 [SEALED], at pp. 18–20; ECF No. 14.6, at p. 2.)

### c. Teleflex

20.     KNC invoiced Teleflex for services ████████, all in 2007 and 2008. (ECF No. 66.11 [SEALED], at pp. 213–14; ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 21.)  Since that time, the record only shows one purchase order between KNC and a subsidiary of Teleflex.  (ECF No. 66.8 [SEALED], redacted at ECF No. 79.1, at p. 43.)  Tutton did not know KNC ever performed work for Teleflex.  (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 23.)  There is no evidence that Tutton performed work directly for Teleflex while at KNC.  I-Tech performed services for Teleflex as a subcontractor of JCI.  (ECF No. ECF No. 67.7 [SEALED], at pp. 23–26; ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 16.)

### d. Thomas Bus

21.     KNC invoiced Thomas Bus solely for services performed for Thomas Bus in 2008.  (ECF No. 66.11 [SEALED], at p. 215; ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 22.)  KNC has not done any work directly for Thomas Bus since 2008.  (ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 22.)  KNC believes it has done work for Thomas Bus indirectly through some outside company that it cannot identify.  (*Id*. at p. 21.)  In response to a subpoena, Thomas Bus was not able

to find any documents regarding work performed by KNC between November 9, 2012 and the present. (ECF No. 66.8 [SEALED], redacted at ECF No. 79.1, at pp. 45–46.) Tutton did not know KNC ever worked for Thomas Bus. (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 23.) There is no evidence that Tutton worked directly with Thomas Bus while at KNC. I-Tech performed services as a subcontractor of JCI for Thomas Bus. (ECF No. 67.7 [SEALED], at pp. 29–37; ECF No. 66.2 [SEALED], redacted at 74.2, at p. 16.)

### e. WFBH

22. KNC invoiced WFBH one time on January 28, 2013. (ECF No. 66.11 [SEALED], at p. 228.) Tutton was unaware that KNC did work at WFBH. (ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at p. 17.) There is no evidence that Tutton worked directly with WFBH while at KNC. I-Tech performed services as a subcontractor of JCI for WFBH in 2018. (ECF No. 66.3 [SEALED], redacted at ECF No. 81.1, at pp. 23; ECF No. 67.7 [SEALED], at pp. 38–42.)

*vii.* *Accu-Tek, ADI, Norfolk Wire, CSC, and Graybar*

23. With respect to suppliers, it is undisputed that Defendants contacted and purchased supplies from Accu-Tek, ADI, Norfolk Wire, CSC, and Graybar. (ECF No. 73, at p. 9; ECF No. 72, at p. 16.) All of these entities are listed as "suppliers" of KNC in the Consent Order. (*See* ECF No. 3, at Ex. 3, ¶4.)

## II.   PROCEDURAL HISTORY

24. On April 9, 2019, KNC filed the Complaint in this matter, alleging: breach of the Settlement Agreement and Consent Order against Tutton ("First

Claim") and against I-Tech ("Second Claim")[5]; tortious interference against I-Tech ("Third Claim"); misappropriation of trade secrets against Tutton and I-Tech ("Fifth Claim"); unfair trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act against Tutton and I-Tech ("UDTPA") ("Sixth Claim"); and unjust enrichment against Tutton and I-Tech ("Seventh Claim"). (ECF No. 3, at ¶¶ 20–37, 44–58.) The Complaint also requests that the Court disregard I-Tech's corporate form and hold it "jointly and severally responsible for Tutton's conduct" ("Fourth Claim") and "impose a constructive trust and direct Defendants to disgorge all profits gained from the violation of the terms of the Settlement Agreement and Consent Order" ("Eighth Claim"). (*Id.* at ¶¶ 38–43, 59–64.) Shortly after filing the Complaint, on April 17, 2019, KNC filed a Motion for Temporary Restraining Order and Preliminary Injunction which, *inter alia*, requested the Court enforce the terms of Settlement Agreement and Consent Order to preserve the status quo during the pendency of this litigation. (ECF No. 8.)

25. On May 9, 2019, this matter was designated a mandatory complex business case, and assigned to the undersigned. (Desig. Ord., ECF No. 1; Assign. Ord., ECF No. 2.)

---

[5] KNC and Defendants treat the Settlement Agreement and Consent Order as one integrated agreement for purposes of their breach of contract claims, and the Settlement Agreement makes express reference to the permanent injunction to be entered by the Court in the Consent Order. *Simpson v. Beaufort Cty. Lumber Co.*, 193 N.C. 454, 455 (1927) ("A valid contract . . . may consist of one or many pieces of paper, provided the several pieces are so connected physically or by internal reference that there can be no uncertainty as to the meaning and effect when taken together.")

26.     On the same day, Defendants filed an Answer, Motion to Dismiss, and Affirmative Defenses ("Motion to Dismiss," ECF No. 5.)  The Motion to Dismiss sought dismissal of KNC's claims for breach of the Settlement Agreement and Consent Order on grounds that, *inter alia*, the ten-year restrictive period was unreasonable and unenforceable as a matter of law.  The Motion to Dismiss was briefed and a hearing was held.

27.     On October 9, 2019, the Court issued its Order and Opinion on Defendants' Motion to Dismiss, which dismissed all KNC's claims except KNC's First, Second, Third, and Sixth Claims. *KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, *40 (N.C. Super. Ct. Oct 9, 2019) ("Dismissal Order").  In the Dismissal Order, the Court denied Defendants' Motion to Dismiss KNC's claims for breach of the Settlement Agreement and Consent Order, holding that

> the ten-year duration of the covenant in the Consent Order is reasonable and enforceable.  Tutton admittedly violated the Non-compete Agreement after his resignation from KNC.  KNC brought a lawsuit against Tutton and the lawsuit was settled prior to trial, in part, because Tutton agreed to a set of narrowly-tailored restrictions on his ability to solicit KNC's customers and vendors for approximately ten years.  Tutton is not prohibited from competing with KNC.  Rather, he is restricted only from soliciting, contacting, or making sales to KNC's customers and to eight of KNC's vendors and suppliers . . . .  The restrictions in the Consent Order do nothing more than protect KNC's business interests, which Tutton has already demonstrated a propensity to ignore.  Therefore, the Court finds that the non-compete contained in the Consent Order is valid, reasonable, and enforceable.

(*Id.* at *17–18.)

28.     On October 10, 2019, the Court issued its Order on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, which "enjoined and prohibited [Tutton], directly or indirectly, alone or in concert with others, during the pendency of this lawsuit or until further order of this Court" from "soliciting, contacting, and/or making sales to" KNC's customers and suppliers.[6]  (ECF No. 30.)

29.     On August 31, 2020, KNC filed the Motion for Partial Summary Judgment, along with a brief in support  ("Plaintiff's Brief in Support of SJ," ECF No. 73), and exhibits (ECF No. 67.1 [SEALED], redacted at ECF No. 75.1; ECF Nos. 67.2–6; ECF No. 67.7 [SEALED]; ECF No. 67.8; ECF No. 67.9 [SEALED]; ECF No. 67.10; ECF Nos. 67.11–12 [SEALED], redacted at ECF Nos. 81.4–5; ECF No. 67.13; ECF No. 67.14 [SEALED]; ECF No. 67.15 [SEALED], redacted at ECF No. 75.2). Defendants filed a Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendants' Brief in Opposition to SJ," ECF No. 91), and exhibits (ECF No. 87.1 [SEALED], redacted at ECF No. 88.1; ECF Nos. 87.2–6).  KNC filed a Reply Brief in Support of its Motion for Partial Summary Judgment.  (ECF No. 93.)

30.     Also on August 31, 2020, Defendants filed their Motion for Summary Judgment on all claims (ECF No. 64), along with a brief in support (Defendants' Brief in Support of SJ, ECF No. 72) and exhibits (ECF Nos. 66.1–4 [SEALED], redacted at ECF Nos. 74.1–3, 81.1; ECF Nos. 66.5–6; ECF No. 66.7 [SEALED], redacted at ECF No. 74.4; ECF No. 66.8 [SEALED], redacted at ECF No. 79.1; ECF Nos. 66.9–10; ECF

---

[6] Tutton was permitted to complete "any current contracts, projects, or other work he is already performing for KNC's customers as of the issuance of the temporary restraining order and preliminary injunction."  (ECF No. 30, at p. 13.)

No. 66.11 [SEALED]; ECF No. 66.12 [SEALED], redacted at ECF No. 81.2; ECF No. 66.13 [SEALED], redacted at ECF No. 79.2; ECF No. 66.14; ECF No. 66.15 [SEALED], redacted at ECF No. 74.5; ECF No. 66.16; ECF No. 66.17 [SEALED], redacted at ECF No. 74.6; ECF No. 66.18–20). Plaintiff filed a Brief in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Brief in Opposition to SJ," ECF No. 90) and exhibits (ECF Nos 84.1–84.5). Defendants filed their Reply Brief in Support of Defendants' Motion for Summary Judgment. (ECF No. 92.)

31. Finally, also on August 31, 2020, Defendants filed their Motion to Exclude (ECF No. 68), along with a brief in support (Bf. in Supp. of Mot. to Excl Exp. Test. of Erik Lioy, ECF No. 69) and exhibits (ECF No. 70.1–2). KNC filed a Brief in Opposition to Defendants' Motion to Exclude Expert Testimony of Erik Lioy (ECF No. 77) and exhibits (ECF No. 78.1–2). No reply brief was filed.

32. The Court held a hearing on the Motions on November 30, 2020. The Motions are now ripe for decision.

III. ANALYSIS

A. **Standard of Review**

33. Summary judgement is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs.*, 365 N.C. 520, 523 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is

'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *CSX Transp., Inc. v. City of Fayetteville*, 247 N.C. App. 517, 521 (2016) (quoting *Lowe v. Bradford*, 305 N.C. 366, 369 (1982)).

34.    On a motion for summary judgment, the Court views the evidence in the "light most favorable to the non-moving party." *Allstate Ins. Co. v. Lahoud*, 167 N.C. App. 205, 207 (2004) (citation omitted). "The party moving for summary judgment ultimately has the burden of establishing the lack of any issue of triable fact." *Unitrin Auto & Home Ins. Co. v. McNeill*, 215 N.C. App. 465, 467 (2011) (citations omitted). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). Once the moving party "makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial." *Unitrin Auto & Home Ins. Co.*, 215 N.C. App. at 467 (citations omitted).

35.    In KNC's Motion for Partial Summary Judgment, KNC seeks entry of summary judgment in its favor on its First Claim for breach of contract against Tutton and its Second Claim for breach of contract against I-Tech. (ECF No. 63.) Defendants' Motion for Summary Judgment seeks summary judgment as to KNC's remaining claims for breach of contract, tortious interference with contract, and violation of the UDTPA. (ECF No. 64, at pp. 1–2.) Defendants also seek summary judgment in their favor that the Liquidated Damages Provision in the Settlement

Agreement is unenforceable. (*Id.* at p. 1.) Since both Motions seek summary judgment on the claims for breach of the Settlement Agreement and Consent Order, the Court will first address the arguments relating to those claims.

**B.** **Waiver**

36. KNC contends that Tutton waived his right to challenge the enforceability of the restrictive covenants because the Consent Order states that Tutton "waives any and all right to seek modification to or relief from its terms until its natural expiration." (ECF No. 93, at pp. 3–4; ECF No. 3, p. 33, ¶ 9.) KNC did not make this argument in Plaintiff's Brief in Support of SJ, but only in reply to Defendants argument that the Consent Order is not beyond judicial review. Defendants point to this Court's prior finding in the Dismissal Order that it is "bound by North Carolina's appellate jurisprudence to treat the Consent Order as a contract" and that "[t]he reasonableness of a non-competition covenant [in a contract] is a matter of law for the court to decide." (ECF No. 91, at pp. 4–5 (quoting *KNC Techs., LLC*, 2019 NCBC 72, at \*11).)

37. It is well settled in North Carolina that a "party may waive a contractual right by an intentional and voluntary relinquishment." *McNally v. Allstate Ins. Co.*, 142 N.C. App. 680, 683 (2001) (citation omitted). "The essential elements of waiver are (1) the existence, at the time of the alleged waiver, of a right, advantage, or benefit; (2) the knowledge, actual or constructive, of the existence thereof; and (3) an intention to relinquish such right, advantage or benefit." *Fetner v. Granite Works*, 251 N.C. 296, 302 (1969) (citation omitted). "The question of waiver is mainly one of

intention, which lies at the foundation of the doctrine." *Comput. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at \*\*28 (N.C. Super. Ct. Dec. 10, 2018) (citing *Butler v. Charlotte-Mecklenburg Bd. of Educ.*, 2012 N.C. App. LEXIS 675, at \*11 (N.C. Ct. App. June 5, 2012)).

38. In Plaintiff's Reply in Support of SJ, KNC provides minimal argument and cursory citation to North Carolina authority, and does not attempt to apply the law regarding waiver to the specific facts of this case. KNC provides no argument and cites to no evidence that, at the time Tutton's attorneys signed the Consent Order, Tutton intended to relinquish his right to a judicial determination as to the enforceability of its terms. The Court is not persuaded that the broad waiver provision in the Consent Order, by itself, is sufficient to establish that Tutton waived his right to seek a judicial review of the enforceability of the restrictive covenants under North Carolina law.

39. In addition, the public policy concerns that require scrutiny of agreements in restraint of trade are not served by permitting parties to divest the courts of their authority to determine the enforceability of restrictive covenants. "At common law all contracts in restraint of trade were against public policy and void." *Kadis v. Britt*, 224 N.C. 154, 158 (1994). However,

> the strict early common law rule invalidating all restraints was relaxed and subsequently replaced by the test of the reasonableness of the restraint. But it must be added that this test must be applied against a public policy which has come to recognize exceptions to the general rule. Contracts in partial restraint of trade do not escape the condemnation of public policy unless they possess qualifying conditions which bring them within that exception. They are still

> contrary to public policy and void if nothing shows them to
> be reasonable.

*Id.* (internal quotations and citations omitted). The task of applying the "test of reasonableness of the restraint" lies with the courts. *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663 (1968) ("The reasonableness of a restraining covenant is a matter of law for the court to decide."). Since the courts must decide whether a restrictive covenant is reasonable, parties cannot shield the covenant from "the condemnation of public policy" through a preemptive waiver of judicial review. *Kadis*, 224 N.C. at 158.

40. Therefore, the Court concludes, as a matter of law, that Tutton has not waived the right to have this Court determine the enforceability of the restrictive covenants in the Consent Order.

## C. I-Tech's Liability for Breach of Contract

41. In its Second Claim, KNC alleges that I-Tech breached the Settlement Agreement and Consent Order. (ECF No. 3, at ¶¶ 25–30.) It is undisputed that I-Tech is not a signatory to the Settlement Agreement or Consent Order. Nevertheless, KNC alleges that "[t]he Settlement Agreement explicitly indicates that its terms are binding on the parties' successors or assigns" and "[u]pon current information and belief, I-Tech is a successor or assign of Tutton and, therefore, is bound to the terms of the Settlement Agreement and Consent Order." (*Id.* at ¶¶ 27–28.) In its Order and Opinion on Defendants' Motion to Dismiss, the Court found:

> [a]lthough the current allegation that I-Tech has succeeded
> to or been assigned Tutton's obligations under the
> Settlement Agreement is threadbare, at this stage of the

proceeding the Court concludes that it should not be dismissed, and Plaintiff should be permitted to take discovery on the issue.

*KNC Techs., Inc.*, 2019 NCBC LEXIS 72, at *25–26. Discovery is now completed.

42. KNC now argues that discovery has established that Tutton holds a 49% membership interest in I-Tech, and "this . . . undercuts" the argument that I-Tech is not a successor of Tutton and bound by the Settlement Agreement and Consent Order. (ECF No. 73, at p. 11.) KNC cites no authority for the proposition that a limited liability company becomes a "successor" to contracts entered into by its minority interest owners, nor does KNC make any other argument explaining how I-Tech is a successor to Tutton. *Cf.*, *Terres Bend Homeowners Ass'n v. Overcash*, 185 N.C. App. 45, 51 (2007) ("Citing Black's Law Dictionary 1283 (1979), the North Carolina Supreme Court has defined the term 'successor' to mean '[o]ne that succeeds or follows; one who takes the place that another has left, and sustains the like part or character; one who takes the place of another by succession.'" (quoting *Rosi v. McCoy*, 319 N.C. 589, 593 (1987))).

43. KNC has failed to create an issue of fact that I-Tech is a successor to Tutton for purposes of imposing the obligations of the Settlement Agreement and Consent Order on I-Tech. Therefore, to the extent KNC seeks summary judgment in its favor on its Second Claim for breach of contract by I-Tech, KNC's Motion for Partial Summary Judgment should be DENIED. To the extent Defendants seek summary judgment in their favor on KNC's Second Claim for breach of contract by I-Tech, Defendants' Motion for Summary Judgment should be GRANTED.

### D. Defendants' Challenge to the Enforceability of Restrictive Covenants

44. Defendants challenge the enforceability of the restrictive covenants in the Consent Order and seek summary judgment in their favor on the grounds that the covenants are overbroad and unenforceable as a matter of law. (ECF No. 72, at pp. 6–16.)[7] It is well established that "the reasonableness of a restraining covenant is a matter of law for the court to decide." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663 (1968).

45. In the Dismissal Order, the Court considered Defendants' argument that the restrictive covenant in the Consent Order should be analyzed solely under the law applicable to employer-employee covenants and rejected it. *KNC Techs., LLC*, 2019 NCBC LEXIS 72, at *17 ("[T]he Court declines to adopt Defendants' assertion that the restrictive covenant in the Consent Order should be treated as an employer-employee non-compete."). The Court also considered North Carolina authority on

---

[7] KNC does not argue that Defendants are foreclosed from challenging the enforceability of the restrictive covenants in their Motion for Summary Judgment based on the Court's finding in the Dismissal Order that "the non-compete contained in the Consent Order is valid, reasonable, and enforceable." *KNC Techs., LLC*, 2019 NCBC LEXIS 72 at *18. Nevertheless, the Court notes that the only challenge Defendants raised to the restrictive covenants in their Motion to Dismiss was to the ten-year restrictive period, and a ruling on the enforceability of the customer restriction could not be determined without discovery. To the extent the Dismissal Order can be read as addressing issues other than the reasonableness of the restrictive period, the Court hereby revises its prior ruling to make clear that it addressed only the reasonableness of the ten-year restrictive period. N.C.G.S. § 1A-1, Rule 54(b) ("In the absence of entry of [ ] a final judgment, any order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."). As demonstrated by the discussion herein, the determination of the reasonableness of the Customers Restriction has benefitted from the development of the facts through discovery. *See Mkt. Am., Inc. v. Lee*, 257 N.C. App. 98, 110 (2017) (citation omitted).

enforcement of restrictive covenants contained in agreements between buyers and

sellers of businesses. *Id.* at \*14. Finally, the Court stated, in relevant part, as follows:

> While the law in North Carolina regarding these traditional categories of non-competes is robust, "[a] number of prior decisions . . . dealing with the enforceability" of non-compete agreements "involved situations which do not fit neatly into either the employer-employee category or the business sale category." *Outdoor Lighting Perspectives Franchising v. Harders*, 228 N.C. App. 613, 621 (2013). "[P]ractical differences between the typical employer-employee arrangement and the typical buyer-seller arrangement render it illogical to conclude that the rules typically govern[ing] either arrangement should be applied with unbending rigidity." *Id.* at 622, 747 S.E.2d at 263.
>
> In *Outdoor Lighting*, the court declined to accept plaintiff's argument that a non-compete agreement between a franchisor and franchisee should be analyzed solely under the employer-employee rubric. *Id.* at 621–22. The court concluded that the franchisor-franchisee relationship was a "hybrid situation" differing from both employer-employee and buyer-seller context and did not fit neatly into either category. *Id.* at 621. . .
>
> In *Outdoor Lighting*, the court elected to utilize elements of both the employer-employee and the buyer-seller categories when analyzing the non-compete in the franchisor-franchisee context. *Id.* After assessing the varying degrees of relevance of the factors in the employer-employee and buyer-seller context, the court concluded that: "the ultimate issue . . . in resolving such disputes . . . is the extent to which the non-competition provision . . . is no more restrictive than necessary . . . with relevant factors to include . . . duration . . . geographic scope . . . and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor." *Id.* at 623, 747 S.E.2d at 264.

*Id.* at \*15–16. Finally, applying the reasoning underlying *Outdoor Lighting*, the

Court held "that the facts alleged in this case do not fit squarely under the analysis

applied to restrictive covenants between employer and employee or buyer and seller, but instead call for a more situation-specific approach." *Id*. at *16–17.

46. In accordance with the conclusion reached in the Dismissal Order, the Court now considers Defendants' arguments regarding the enforceability of the Consent Order to determine, under the specific facts of this case, whether the restrictive covenant is no more restrictive than necessary to protect KNC's legitimate business interests. Briefly summarized, the specific undisputed facts of this case establish that Tutton admittedly committed egregious violations of restrictive covenants contained in the Non-Compete Agreement he executed during his employment with KNC; that KNC sued Tutton (*Tutton I*) and Nitor (Nitor Lawsuit) as a result of those violations; that KNC and Tutton were represented by counsel in *Tutton I*; that KNC and Tutton negotiated a Settlement Agreement and a Consent Order resolving KNC's claims against Tutton in *Tutton I*; that as part of the consideration provided by Tutton, he agreed to restrictive covenants prohibiting him for a period of ten years from soliciting, contacting, and/or making sales to KNC customers and to certain KNC suppliers; and that the restrictive covenants were contained in a Consent Order entered by the court in *Tutton I*.

i. *Length of Restrictive Period*

47. Defendants first argue that the ten-year length of the restrictive period in the Consent Order is too long and therefore unenforceable as a matter of law. (ECF No. 72, at pp. 8–9.) Defendants raised this argument in their Motion to Dismiss, and the Court rejected it at that early stage of the proceeding in its Dismissal Order. *KNC*

*Techs., LLC*, 2019 NCBC LEXIS 72, at \*17 ("On these facts, the Court is compelled to find that the ten-year duration of the covenant in the Consent Order is reasonable and enforceable."). The Court will concludes that its determination, even aided by discovery conducted since then, is correct and will not revisit this issue again.

*ii. Customers Restriction*

48. Defendants also now raise a different challenge to the restrictive covenants, arguing that KNC's "interpretation" of the term "customers" as including *all* KNC customers since KNC's formation in 2003 through November 14, 2013 is overly broad and unenforceable. (ECF No. 72, at p. 9.) KNC's understanding of "customers" as defined in the Consent Order appears to be well-founded. The Consent Order prohibits Tutton from "indirectly or directly soliciting[,] contacting, and/or making sales to any customers of [KNC]" and very clearly defines "customers" as "any party KNC provided services as of November 14, 2013," which appears to unambiguously include all individuals and entities to which KNC provided services from KNC's inception in 2003 up through November 14, 2013. (ECF No. 3, at Ex. 3, ¶¶ 1–2.)

49. Defendants argue that such a broad definition of "customers" unreasonably restricts Tutton from soliciting or even contacting customers with which Tutton had no contact as a KNC employee; customers for which KNC performed a single, isolated job or for which KNC had not performed work for at least several years prior to November 14, 2013; customers for which KNC performed work only during periods that Tutton was not even employed by KNC; and customers for

which Defendants performed work only as a subcontractor of JCI. (ECF No. 72, at p. 9–16.) Defendants contend that in restrictive covenants between employers and employees, "[a] client-based limitation cannot extend beyond contacts made during the period of employment." (*Id.* at pp. 9–10; quoting *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 282 (2000) and citing other North Carolina authority holding the same.)

50. Defendants further argue that the unreasonable nature of the restriction is exacerbated by the fact that KNC and Tutton never agreed on a list of customers falling within the definition of "customers" under the Consent Order. Defendants contend, and KNC doesn't dispute, that the record evidence does not support a claim that Tutton possessed a list or had knowledge of all of KNC's customers at the time the Consent Order was entered. (ECF No. 72, at p. 11.) The customer list produced by KNC that is in the record is 237 pages long and identifies many hundreds of KNC customers for which it performed work between January 2003 and November 2013. (ECF No. 66.11 [SEALED], pp. 1–238.) KNC does not provide information in its briefing as to which of these customers Tutton had contact with during his employment with KNC.

51. Finally, Defendants point to evidence showing that, even with regard to the ten KNC customers that KNC claims Tutton solicited or contacted in violation of the Consent Order, Tutton never had contact with at least seven of them while he was employed with KNC. (ECF No. 72, at pp. 12–16.) KNC had not performed work

for at least four of the ten customers since 2010. (*Id.*) KNC does not dispute this evidence.

52. Thus, the Customers Restriction prohibits Tutton from contacting any customer for which KNC has ever performed services since KNC's inception in 2003 without regard to (a) when KNC performed work for the customer, (b) the number of jobs KNC performed for the customer or how long a relationship KNC had with the customer, or (c) whether Tutton provided services to the customer or even ever had contact with the customer. While KNC undoubtedly has an interest in its customer relationships, the sweeping nature of the Customers Restriction does not appear to be designed to protect KNC's legitimate business interests. For example, the evidence establishes that the Customers Restriction would prohibit Tutton from contacting, in 2018, customers which KNC last performed services in 2008 and 2010, and with which Tutton had no contact as a KNC employee. (ECF No. 72, at pp. 12–16.) The restrictive covenant also would prevent Tutton from performing services *indirectly* as a subcontractor of JCI for Arbor Acres, the City of Greensboro, Teleflex, Thomas Bus, and WFBH. As Tutton explained in his deposition, this is work on proprietary JCI systems that KNC could not be hired to perform:

> Q:     Okay, so you did work [at Thomas Bus], but, again, you feel that you're shielded from them being your customer because of the intermediate contractor?
>
> A:     No, I'm not shielded. You know – and you've got to understand the whole way this thing works. [JCI] has been supporting Thomas Bus, Teleflex, Arbor Acres, everyone we've mentioned, they've been supporting the City of Greensboro. They've been supporting these systems – these proprietary systems. [JCI] installs proprietary

systems. KNC can't work on them. KNC never worked on them. These locations, KNC has never done work on these systems. So, you know, KNC might have done something at Thomas Bus like pull a cable, but when – you know, you're talking about two different systems. And I'm getting off track here, but, you know, a lot of times, we don't know who these customers are. We don't have no interaction with these customers. Our customer is [JCI].

(ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at pp. 16–17.)

53. KNC does not argue that it has a legitimate business interest in such a broad Customers Restriction. Rather, KNC argues that the specific facts of this case warrant enforceability of the Customers Restriction because of Tutton's egregious conduct that was the subject of the Settlement Agreement and Consent Order. (ECF No. 90, at pp. 4–5, 8.)

54. The Court has previously acknowledged the unique circumstances of this case, which involves restrictive covenants obtained by KNC through a negotiated Settlement Agreement resolving a prior lawsuit and a Consent Order entered by the court. *KNC Techs., LLC*, 2019 NCBC LEXIS 72, at *12–13. The Court also has acknowledged what appears to be Tutton's "propensity to ignore" restrictive covenants based on his conduct leading to the filing of *Tutton I*. *Id.* at *18. Nevertheless, the Court's focus must be on "the extent to which the non-competition provision . . . is no more restrictive than necessary." *Outdoor Lighting Perspectives*, 228 N.C. App. at 623. KNC has not demonstrated a legitimate business interest that would support a client-based restriction of this magnitude. Therefore, the Court concludes that the Customers Restriction is overbroad, and therefore unenforceable as a matter of law.

55.     Accordingly, to the extent KNC seeks summary judgment in its favor on its First Claim for breach of contract as to the Customers Restriction, KNC's Motion for Partial Summary Judgment should be DENIED.  To the extent Defendants seek summary judgment in their favor on KNC's First Claim for breach of contract as to the Customers Restriction, Defendants' Motion for Summary Judgment should be GRANTED.

### iii.     Suppliers Restriction

56.     The Suppliers Restriction prohibits Tutton from "soliciting, contacting, and/or making sales to" nine specific KNC suppliers.  Tutton admittedly contacted and made purchases from five of the listed suppliers.  Defendants contend that KNC has not established a legitimate business justification for the Suppliers Restriction because "making a purchase from a supplier does not harm KNC," and therefore the Court should find the covenant restricting Tutton from "contacting" KNC's Suppliers unenforceable.  (ECF No. 91, at p. 15.)

57.     KNC contends that "[r]elationships with suppliers improve a contractor's business" and "can provide better pricing and access to training."  (ECF No. 73, at p. 10.)  KNC argues that "[i]t would make sense for KNC, in its efforts to settle its claims in *Tutton I*, to have Mr. Tutton agree to not compete by taking advantage of KNC's relationship with its suppliers."  (ECF No. 73, at p. 10.)  Finally, KNC points to the fact that Tutton's purchases from the suppliers listed in the Consent Order were "wholly unnecessary" because Tutton admits he could have obtained the same materials from suppliers not listed in the Suppliers Restriction.

(ECF No. 73, at p. 10; ECF No. 67.15 [SEALED], redacted at ECF No. 75.2, at pp. 21–22.)

58. Defendants provide evidence that any alleged advantage Tutton could get from using KNC's suppliers is largely illusory because a supplier's pricing is simply a product of the volume of purchases, as set by the manufacturer, and the supplier has little discretion in setting pricing. (ECF No. 66.19, at pp. 2, 4–7; ECF No. 87.4, at pp. 1–2.)

59. While the evidence indicates that KNC's business interest in prohibiting Tutton from purchasing materials from KNC's suppliers in tenuous, the Court concludes that, under the specific facts of this case, the Suppliers Restriction is not unreasonable. First, unlike the Customers Restriction, prohibiting Tutton from using a discrete list of suppliers has little impact on Tutton's ability to work in his field of expertise. Tutton admittedly is able to purchase materials necessary to I-Tech's business from suppliers other than those from which he is restricted.

60. Second, the nine expressly identified suppliers listed by KNC are likely its key suppliers. Defendants do not claim that there is evidence that KNC had not done business with the specific suppliers for long periods of time or that Tutton did not have contact with these suppliers during his employment with KNC.

61. Finally, given the facts underlying *Tutton I*, it was not unreasonable for KNC to seek limited constraints on Tutton's ability to immediately compete with KNC by potentially trading on KNC's goodwill with its suppliers to obtain favorable pricing or other advantageous treatment. While KNC ultimately overreached in

attempting to prohibit solicitation of every *customer* with which it had ever done business, the prohibition on Tutton's contact with targeted suppliers is more reasonable.

62. Therefore, the Court concludes that the Customers Restriction prohibiting Tutton from contacting the nine expressly identified suppliers is not unreasonable.

**E.  Claim for breach of Suppliers Restriction**

63. KNC's First Claim for breach of contract encompasses a claim that Tutton breached the Suppliers Restriction. It is undisputed that Tutton, directly or indirectly through I-Tech, purchased supplies from five suppliers on the list of restricted suppliers: Accu-Teck, ADI, Norfolk Wire, CSC, and Graybar. (ECF No. 91, at p. 15; ECF No. 72, at p. 16.) Nevertheless, Defendants argue that "the plain language [of the Suppliers Restriction] mirrors the language regarding customers and implies the restriction is on sales and contact leading to sales," and not purchases. (ECF No. 91, at p. 15.) KNC does not respond to this specific argument by Defendants.

64. "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Bank of Am., N.A. v. Rice,* 230 N.C. App. 450, 456 (2013); *see also Lynn v. Lynn*, 202 N.C. App. 423 (2010) ("Whether or not the language of a contract is ambiguous . . . is a question for the court to determine."). A plain and unambiguous contract must be

interpreted as written. *RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 251 N.C. App. 562, 568 (2017). If a contract is ambiguous, however, interpretation of the contract is a question of fact for the jury. *Variety Wholesalers, Inc.*, 365 N.C. at 525. An ambiguity exists when the effect of provisions is uncertain or capable of several reasonable interpretations. *Id.*

65. The Suppliers Restriction prohibits Tutton from "soliciting, contacting, and/or making sales to any Suppliers of [KNC]" but does not expressly prohibit *purchasing* from KNC's suppliers. (ECF No. 3, at Ex. 3, ¶ 3.) Further, the Suppliers Restriction uses the term "and/or," which can be interpreted as either conjunctive or disjunctive and is ambiguous. *Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at *23 (N.C. Super. Ct. May 8, 2018) (finding that the use of "and/or" in prohibitions within a restrictive covenant "creates an ambiguity" because the prohibition "could be read in both the conjunctive and disjunctive senses"), *aff'd per curiam*, 372 N.C. 260 (2019). In the conjunctive, the term "soliciting, contacting, *and* making sales to any Suppliers" could support Defendants' interpretation of the provision as prohibiting only contacts or solicitations of the suppliers that result in sales by one or more of the Defendants. Read in the disjunctive, the provision can be interpreted as prohibiting each of the separate activities of soliciting, contacting, or making sales, and would make Tutton's contact with KNC's suppliers for purposes of making purchases a breach of the Suppliers Restriction. Accordingly, the Court concludes that the language in the Suppliers Restriction is susceptible of two reasonable interpretations and is ambiguous.

66. Since the Suppliers Restriction is ambiguous, the Court cannot decide KNC's claim that Tutton breached the Consent Order by contacting KNC's suppliers. Therefore, to the extent KNC seeks summary judgment in its favor on its First Claim of breach of contract for violation of the Suppliers Restriction, KNC's Motion for Partial Summary Judgment should be DENIED. To the extent Defendants seek summary judgment in their favor on KNC's First Claim of breach of contract for violation of the Suppliers Restriction, Defendants' Motion for Summary Judgment should be DENIED.

**F.    The Liquidated Damages Provision and the Motion to Exclude**

67. Defendants seek summary judgment on their argument that the Liquidated Damages Provision in the Settlement Agreement is an unenforceable penalty. (ECF No. 64, at p. 1; ECF No. 72, at pp. 16–25.) "[I]t is well established that a sum specified in the contract as the measure of recovery in the event of a breach will be enforced if the court determines it to be a provision for liquidated damages, but not enforced if it is determined to be a penalty." *Majestic Cinema Holdings, LLC v. High Point Cinema, LLC*, 191 N.C. App 163, 167 (2008) (citing *Brenner v. Little Red Schoolhouse, Ltd.*, 302 N.C. 207, 214 (1981)). Our Supreme Court has distinguished between liquidated damages provisions in contracts, which are enforceable, and penalty clauses which are not enforceable:

> Liquidated damages are a sum which a party to a contract agrees to pay or a deposit which he agrees to forfeit, if he breaks some promise, and which, having been arrived by a good faith effort to estimate in advance the actual damage which would probably ensue from the breach, are legally recoverable and retainable . . . if the breach occurs. A

penalty is a sum which a party similarly agrees to pay or forfeit . . . but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach, or as security . . . to insure that the person injured shall collect his actual damages.

*Kinston v. Suddreth*, 266 N.C. 618, 620 (1966) (citation and internal quotations omitted). In order to determine whether a fixed sum as a measure of recovery is a liquidated damage or an unenforceable penalty, "this Court will consider 'the nature of the [c]ontract, the intention of the parties, [and] the sophistication of the parties . . . .'" *Majestic Cinema Holdings, LLC*, 191 N.C. App. at 167 (quoting *E. Carolina Internal Med., P.A. v. Faidas*, 149 N.C. App. 940 (2002)). "The party seeking to invalidate the liquidated damages clause bears the burden of proving the provision invalid." *WFC Lynnwood I LLC v. Lee of Raleigh, Inc.*, 259 N.C. App. 925, 929 (2018) (internal citations omitted).

68. Under North Carolina law

[w]hether a stipulated sum will be treated as a penalty or as liquidated damages may ordinarily be determined by applying one or more aspects of the following rule: A stipulated sum is for liquidated damages only (1) where the damages which the parties might reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty *and* (2) where the amount stipulated is either a reasonable estimate of the damages which would probably be caused by a breach *or* is reasonably proportionate to the damages which have actually been caused by the breach.

*Knutton v. Cofield*, 273 N.C. 355, 361 (1968) (emphasis added); *see also Green Park Inn, Inc. v. Moore*, 149 N.C. App. 531, 538–39 (2002).

69.     In this case, the Liquidated Damages Provision provides: "Tutton acknowledges and agrees that [KNC] shall be entitled to a payment of liquidated damages in the amount of Twenty-Five Thousand and No/100 Dollars ($25,000.00) per violation."  (ECF No. 3, at Ex. 2, ¶ 6.)

*i.      Difficulty of calculation*

70.     Defendants provided the testimony of their expert, Michael Womble ("Womble"), that calculating or attempting to estimate an amount of damages resulting from breach of the Consent Order would not have been overly difficult. (ECF No. 72, at pp. 20–23.)  For example, using KNC's historical financial data, Womble calculated, *inter alia*, that:

> • KNC's average revenue, not profit, per job were substantially less than $25,000 each year from 2011-2018. (ECF No. 66.7, 22:7-26:2, 114:24-115:9; ECF No. 66.8, Ex 4, Ex 22; ECF No. 66.18, p. 2).
>
> • Only a small percentage of KNC's jobs actually had gross revenue of $25,000.00 or more in 2011, 2012, or 2013. (ECF No. 66.7, 26:15-29:15, 200:10-202:6, 204:5-205:11; ECF No. 66.8, Ex 5; ECF No. 66.18, p. 2).
>
> • From 2011-2013, KNC's average annual gross profit per job was substantially less than $25,000.00. (ECF No. 66.18, p. 2).

(*Id*. at p. 23.)  Womble also determined that for the years 2011–2013, only about 6% of KNC's jobs for customers were for amounts greater than $25,000, and that KNC's average gross profit per job was $1,275.  (ECF No. 66.18, at p. 3.)

71.     In the face of this evidence, KNC provides no explanation as to why calculating damages would have been difficult.  Instead, KNC simply provides the following conclusion from its rebuttal expert, Eric Lioy:

> At the time the Settlement Agreement was executed, and the Consent Order approved, estimating the damages that KNC would incur due to a violation of those agreements would have been difficult.  Womble's opinions to the contrary are flawed and incorrect based on inadequate analysis of the facts and evidence.

(ECF No. 66.16, at p. 5.)   However, Lioy testified that the damages were only uncertain "because you don't know ahead of time . . . what would happen."  (ECF No. 66.15 [SEALED], redacted at ECF No. 74.5, at p. 89.)  Nevertheless, Lioy admitted that the cost of an average job and average profitability per customer could be calculated.  (*Id*. at p. 90.)

72.     While KNC's evidence is sparse, the Court concludes that there remains a genuine dispute of material fact on this issue of whether a reasonable estimate of damages was difficult to ascertain.  Regardless, Defendants may still meet their burden of establishing that the Liquidated Damages Provision is unenforceable by a showing that the stipulated amount is not a "reasonable estimate" of the damages likely to be caused by a breach *and* is not "reasonably proportionate" to the damages actually caused by the breach.  *Green Park Inn, Inc.*, 149 N.C. App. at 538–39.

ii.     *Reasonable estimate or reasonably proportionate to actual damages*

73.     Defendants argue that, even if KNC has created an issue of fact as to the difficulty of calculating the damages that would result from a breach, the undisputed facts establish that the $25,000 Liquidated Damages Provision was not a

reasonable estimate of the damages that would be caused by a breach, nor is it reasonably proportionate to the actual damages that resulted from any breach. (ECF No. 72, at pp. 20–25.)

74. Defendants note that KNC was unable to provide any explanation for how the sum of $25,000 was calculated or how it reflected a reasonable estimate of KNC's potential damages.[8] (*Id.* at p. 20 (citing testimony of KNC's corporate witness, ECF No. 66.7, *passim*.).) Rather, KNC's corporate witness admitted under oath that the $25,000 Liquidated Damages Provision was intended to be a "deterrent" or "penalty" to discourage Tutton from breaching the Settlement Agreement and Consent Order:

> Q: Okay. From KNC's point of view, was the point of the $25,000 provision just to be there as a – a stick or a sword to make sure [Tutton] didn't violate the – the agreement?
>
> A: It should have been a deterrent.
>
> Q: But from KNC's point of view was that the – the reason for the $25,000 figure?
>
> A: No. The reason for the $25,000 figure was the injunction. The injunction was signed in order to keep [Tutton] from competing with – directly with KNC's customers, or against us with our customers and our suppliers.
> . . .
>
> Q: Okay, but back in August and September of 2014, was KNC's perspective on $25,000 that it was a number that would, you know, motivate [ ] Tutton not to break the agreement?

---

[8] Defendants also note that KNC did not have Lioy analyze whether $25,000 per violation was a reasonable estimate of KNC's damages or reasonably proportionate to KNC's actual damages. (*Id.* at p. 24 (citing ECF No. 66.15 [SEALED], redacted at ECF No. 74.5, at p. 15).)

A:    It should have, yes.

Q:    From KNC's perspective was that the primary reason that, you know, $25,000 was selected?

A:    I don't know if that was the primary reason, but it was to ensure that there was – a – a penalty for a combination of things, and that is copying the network, illegal acts, and then furthermore, you know, if you don't keep the agreement this is what's going to happen.

(ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 9.)

75.    Further, Defendants cite to the following testimony from KNC's corporate witness, which reveals KNC's intention as to the application of the Liquidated Damages Provision:

Q:    Okay, and if there are three phone calls [by Tutton] to the same KNC customer that don't result in any work, are those three phone calls a $75,000 violation?

A:    If we know about them, yes.
. . .

Q: And if there are multiple phone calls to the same supplier is each phone call a separate $25,000 violation?

A: Yes.

(ECF No. 66.7 [SEALED], redacted at ECF No. 74.4, at p. 3.)  Naturally, Defendants argue that a calculation of damages under the Liquidated Damages Provision, as KNC would have it, cannot be a reasonable estimate of damages or reasonably proportionate to the damages actually suffered by KNC.  (ECF No. 72, at p. 23.)  This would result in a $25,000 "liquidated damage" for each and every time Tutton came in "contact" with a KNC customer or supplier, regardless of whether that contact

resulted in actual work. Further, Defendants point out that the total damages KNC is seeking are more than KNC's total gross profit per job in 2011 and 2012, per year or combined.[9] (ECF No. 72, at p. 24 (citing ECF No. 66.18, at pp. 1–3).)

76. KNC does not respond to most of the evidence presented by Defendants showing that $25,000 is not a reasonable estimate of the damages KNC would suffer from a breach of the Consent Order and not proportional to the damages KNC actually suffered. Rather, KNC contends only that it believes damages would have been difficult to estimate, and that the Liquidated Damages Provision should be enforced because the parties agreed to it in the Settlement Agreement. (ECF No. 91, at pp. 10–12.)

77. The undisputed facts establish that the $25,000 per violation Liquidated Damages Provision was neither a reasonable estimate of the damages that would be caused by a breach of the Consent Order nor reasonably proportionate to the damages which were actually caused by the alleged breaches. The undisputed facts also establish that the Liquidated Damages Provision was intended as a penalty. Defendants have carried their burden of establishing that the Liquidated Damages Provision is unenforceable. *WFC Lynnwood I LLC*, 259 N.C. App. at 929. Accordingly, the Court concludes that the Liquidated Damages Provision in the Settlement Agreement of $25,000 per violation is an unenforceable penalty.

---

[9] Defendants contend that "KNC remains unable to calculate the full scope of its liquidated damages, only calculating liquidated damages 'in excess of $2 million' regarding Customers and 'exceeds $1,000,000' for Suppliers." (ECF No. 72, at p. 23 (citing KNC's Responses to Defs' First Interrogs., ECF No. 66.9; KNC's Supp. Responses to Defs.' First Interrogs., ECF No. 66.10, at pp. 3–5; ECF No. 66.7, at pp. 168).)

Therefore, to the extent Defendants seek summary judgment in their favor on the issue of the enforceability of the Liquidated Damages Provision, Defendants' Motion for Summary Judgment should be GRANTED.

### iii.   *Motion to Exclude*

78.   Defendants move to exclude Eric Lioy's testimony based on various alleged inadequacies in the formulation of his rebuttal opinion.  (ECF No. 69, at pp. 2–5.)  The Court has carefully considered the Motion to Exclude, the briefs filed in support of and in opposition to the Motion to Exclude, the exhibits filed by the parties, the applicable law, and other appropriate matters of record, and concludes in its discretion that the Motion to Exclude should be DENIED, without prejudice to Defendants' right to seek to exclude Eric Lioy's testimony and report from trial in this matter.

## G.   Third and Sixth Claims for Relief

79.   Defendants also move for summary judgment on KNC's remaining claims for tortious interference against I-Tech (Third Claim) and for unfair and deceptive trade practices against both Tutton and I-Tech (Sixth Claim).  (*Id.* at pp. 26–27; *see* ECF No. 3, at ¶¶ 31–37, 49–53.)

### i.   *Tortious Interference with Contract*

80.   In the Complaint, KNC alleges that "[u]pon current information and belief, I-Tech intentionally induced Tutton to breach the [Settlement Agreement and Consent Order]" and "I-Tech's actions were done without justification."  (ECF No. 3, at ¶¶ 34–35.)  Defendants argue that they are entitled to summary judgment on the

claim for tortious interference on the grounds that (a) there is no evidence that I-Tech intentionally induced Tutton to breach the Settlement Agreement and Consent Order, and (b) I-Tech did not act with legal malice. (ECF No. 72, at p. 26.) In support of this argument, Defendants contend "[t]he evidence shows the other owners of I-Tech had limited knowledge of the Consent Order" and "I-Tech was not founded to injure or gain advantage over KNC, but to be a family company and support their family," citing to the deposition of Tutton and Regina Bagby. (*Id.* (citing to ECF No. 66.2 [SEALED], redacted at ECF No. 74.2, at pp. 9–10; ECF No. 66.6, at p. 4; ECF No. 66).)

81.    KNC argues that "Defendants appear to confuse actual malice with legal malice" and "[a]t a minimum, the sheer volume of contacts and jobs that Defendants acquired with [GCS] at times in directly [*sic*] competition with KNC, creates an issue of material fact," precluding summary judgment on this claim. (ECF No. 90, at p. 12.)

82.    The elements of a claim for tortious interference with contract are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 699 (2016). "This Court has interpreted 'induce' to mean 'purposeful conduct,' 'active persuasion, request, or petition.'" *Charah, LLC v. Sequoia Servs. LLC*, 2019 NCBC LEXIS 18, at *18 (N.C. Super. Ct. Mar. 11, 2019) (quoting *KRG New Hill Place, LLC*

*v. Springs Inv'rs, LLC*, 2015 NCBC LEXIS 20, at \*14–15 (N.C. Super. Ct. Feb. 27, 2015)) (citation omitted). "[T]he inducement required to establish a claim for intentional interference . . . requires purposeful conduct intended to influence a third party not to enter into a contract with the claimant." *KRG New Hill Place, LLC*, 2015 NCBC LEXIS 20, at \*15.

83. KNC did not respond to Defendants' argument that there is no evidence that I-Tech induced Tutton to breach the Settlement Agreement and Consent Order. Further, Defendants provided no evidence of any purposeful conduct by I-Tech or any of its owners or employees to induce Tutton to breach the Settlement Agreement and Consent Order. (ECF No. 90, at p. 12.) Therefore, to the extent Defendants seek summary judgment in their favor on KNC's Third Claim for tortious interference of contract against I-Tech, Defendants' Motion for Summary Judgment should be GRANTED.

*ii. Unfair and Deceptive Trade Practices*

84. In its Complaint, KNC alleges that "Defendants have engaged in unfair trade practices and methods of competition, including engaging in willful violations of this Court's permanent injunction" in violation of the UDTPA. (ECF No. 3, at ¶ 50.) Defendants argue that KNC's UDTPA claim should be dismissed on summary judgment because "[t]here is no evidence of egregious or aggravating circumstances necessary to prove a UDTP[A] claim." (ECF No. 72, at p. 27.) Further, Defendants argue that the "violation of a covenant not-to-compete, essentially a breach of contract

within the employer/employee relationship, lies outside the scope of the UDTP[A]," quoting *Kinesis Advertising, Inc. v. Hill*, 187 N.C. App. 1, 21 (2007). (*Id.*)

85.    KNC argues that "[t]he volume of violations [of the Consent Order by Tutton] is sufficient to create an issue of material fact as to the UDTP[A] claim" and the precedent in *Kinesis Advertising* should not apply because "the facts unique to this case[ ] show that the analogy to employer-employee non-competition agreements is wholly inappropriate[.]" (ECF No. 90, at p. 13.)

86.    A claim of unfair trade practices requires proof of "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the [plaintiff]." *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 738 (2008). However, "a mere breach of contract, albeit willful or intentional, cannot serve as the sole basis for a UDTP[A] claim." *Flanders/Precisionaire Corp. v. Bank of N.Y. Mellon Trust Co.*, 2015 NCBC LEXIS 36, at *37 (N.C. Super. Ct. Apr. 7, 2015) (citing *Mitchell v. Linville*, 148 N.C. App. 71, 74 (2001)). A "breach of contract must be accompanied by aggravating circumstances—which may include 'forged documents, lies, and fraudulent inducements'—to elevate it to an unfair or deceptive trade practice." *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2017 NCBC LEXIS 68, at *9–10 (N.C. Super. Ct. Aug. 4, 2017) (citation omitted).

87.    The Court already has concluded that I-Tech cannot be held liable for violations of the Settlement Agreement and Consent Order and granted summary judgment to Defendants on KNC's claims against I-Tech for breach of contract. The

Court also has granted summary judgment to Defendants on KNC's claim for tortious interference with contract against I-Tech. Therefore, the Court concludes that there are no grounds upon which I-Tech can be held liable for engaging in unfair trade practices against KNC under the UDTPA. To the extent Defendants seek summary judgment in their favor on KNC's claim against I-Tech for violation of the UDTPA, Defendants' Motion for Summary Judgment should be GRANTED.

88. KNC's claim against Tutton for violation of the UDTPA rests upon the claim that Tutton breached the Settlement Agreement and Consent Order. More specifically, KNC's UDTPA claim now rests upon Tutton's breach of the Suppliers Restriction. To the extent Defendants argue that the UDTPA claim against Tutton should be dismissed because it involves breach of a contract arising from the employer/employee relationship that is outside of the protections of the UDTPA, *see Kinesis Advertising*, 187 N.C. App. at 21, the Court disagrees with Defendants' argument. This case does not involve violation of an agreement between an employer and employee, it involves violation of a Consent Order entered as result of settlement between civil litigants. The Court finds the facts underlying this case do not fall under the holding in *Kinesis Advertising*.

89. While the alleged breaches of the Suppliers Restriction do not fall within the traditional categories of "aggravating circumstances" which support a claim under the UDTPA, *see Tillery Envtl. LLC*, 2017 NCBC LEXIS 68, at *9–10, the facts and circumstances weigh against dismissal of the UDTPA claim at this stage. As previously addressed by this Court in assessing the Suppliers Restriction's

reasonableness, the Suppliers Restriction targets nine specifically listed entities of which Tutton was clearly and unambiguously put on notice. Further, Tutton is admittedly able to purchase materials necessary to I-Tech's business from suppliers other than those listed in the Suppliers Restriction. When considered in the context of Tutton's apparent disregard for the restrictive covenants in the Settlement Agreement and Consent Order, there is a question of fact as to whether Tutton intended to comply with the Suppliers Restriction at the time entered into the agreements. *See Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 196–97 (2014) (acknowledging that a party's intention to "break its promise at the time that it made the promise" may qualify as an aggravating circumstance supporting a UDTPA claim). For these reasons, to the extent Defendants seek summary judgment in their favor on KNC's claim against Tutton for violation of the UDTPA, Defendants' Motion for Summary Judgment should be DENIED.

IV.    CONCLUSION

THEREFORE, IT IS ORDERED that the Motions are **GRANTED, in part, and DENIED, in part,** as follows:

1. To the extent Defendants seek summary judgment in their favor on KNC's claim that Tutton breached the Customers Restriction (First Claim), Defendants' Motion for Summary Judgment is **GRANTED**;

2. To the extent Defendants seek summary judgment in their favor on KNC's claim that Tutton breached the Suppliers Restriction (First Claim), Defendants' Motion for Summary Judgment is **DENIED;**

3. To the extent Defendants seek summary judgment in their favor on KNC's claim of breach of contract against I-Tech (Second Claim), Defendants' Motion for Summary Judgment is **GRANTED**;

4. To the extent Defendants seek summary judgment on the contention that the Liquidated Damages Provision is unenforceable, Defendants' Motion for Summary Judgment is **GRANTED**;

5. To the extent Defendants seek summary judgment in their favor on KNC's tortious interference with contract claim (Third Claim), Defendants' Motion for Summary Judgment is **GRANTED**.

6. To the extent Defendants seek summary judgment in their favor on KNC's UDTPA claim (Sixth Claim), Defendants' Motion for Summary Judgment is **DENIED**;

7. Defendants' Motion to Exclude (ECF No. 68) is **DENIED**, without prejudice; and

8. KNC's Motion for Partial Summary Judgment on its breach of contract claims against Tutton (First Claim) and I-Tech (Second Claim) is **DENIED**.

SO ORDERED, this the 8th day of April, 2021.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases